O’NIELL, Chief Justice.
 

 This is an action for slander of title of a tract of land of which the plaintiff has possession as owner. The land comprises the 30 acres described as the W% of SEJ4 of the SW% of Section 19, T. 15 N., R. 3 E., in Caldwell Parish. The plaintiff claims that as possessor of the land he possesses also the mineral rights in the land, and claims therefore that he has acquired title to the mineral rights from the defendants by the prescription of 10 years acquirendi causa. He charges that the defendants, who had a mineral servitude on a large tract of land of which his 30-acre tradt forms a part, are now slandering his title by claiming the mineral servitude on his 30 acres of land.
 

 The defendants, Shell Oil Company, Inc., Louisiana Central Oil and Gas Company and Louisiana Central Lumber Company, i'n their answer to the suit admitted that the plaintiff was in possession as owner of the surface of the 30 acres of land but denied that he was in possession of any minerals or mineral interest in the land. They averred that they were the owners and possessors of a mineral servitude on the 30 acres of land. After trial of the case the court gave judgment for the plaintiff, ordering the defendants to disclaim any and all interest in the 30 acres of land, and particularly in the mineral servitude or mineral rights therein, unless they would assert their claim by an action in revendication within 30 days. The basis for the judgment was the court’s finding that, although there had been a severance of the mineral rights from the land, and although the defendants had become thereby the owners of the mineral rights or mineral servitude on the land, the plaintiff by virtue of his possession of the land itself for , more than 10 years had acquired title to the mineral rights by the prescription of 10 years acquirendi causa. The defendants are appealing from the decision.
 

 The parties submitted the case on a stipulation of facts, supplemented by certain documentary evidence
 
 and
 
 by the testimony of one witness, whose 'testimony was confined to the extent of the drilling operations conducted by him as lessee of one of the defendants, Louisiana Central Oil and Gas Company.
 

 On March 15, 1926, the Louisiana Central Lumber Company, being the owner of a vast area of land, approximately 80,-000 acres, free of any mineral servitude, including the 30 acres now owned by the plaintiff, transferred the whole 80,000 acres to the Brown Paper Mill Company, re
 
 *270
 
 serving to the Louisiana Central Lumber Company all of the mineral rights in the land transferred. On May 25, 1926, the mineral rights reserved by the Louisiana Central Lumber Company in its sale to the Brown Paper Mill Company were transferred to the Louisiana Central Oil and Gas Company. Both transfers were recorded promptly. On September 5, 1929, by an act of exchange, the Brown Paper Mill Company transferred to Dentis Pan-key Lenard, who is the plaintiff in this suit, the 30 acres of land in which he now ’claims the mineral rights. In the latter transfer, from the Brown Paper Mill Company to Lenard, there was no mention of the mineral rights having been reserved by the Louisiana Central Lumber Com,pany in its sale to the Brown Paper Mill Company on March 15, 1926, nor did the .plaintiff have actual knowledge of the reservation of the mineral rights by the Louisiana Central Lumber Company, notwithstanding the reservation made by the latter on March 15, 1926, and the sale made to the Brown Paper Mill Company were duly recorded in the Conveyance Records. Lenard, the plaintiff in this suit, went into possession of his 30 acres of land immediately after, acquiring the title from the Brown Paper Mill Company and has had possession .of the surface of the 30 acres of land continuously since that time. The plaintiff, however, has never conducted or attempted to conduct any mining operations for the discovery of oil or gas or other minerals on the 30_ acres of land, nor has anyone as lessee of the plaintiff conducted or attempted to conduct any such operations.
 

 On December 20, 1935, within the 10 years immediately following the mineral ■reservation made by the Louisiana Central Lumber Company in its sale to the Brown Paper Mill Company, a mineral lessee, named G. W. Zeigen, holding a lease from the Louisiana Central Oil and Gas Company, commenced drilling a well for oil or gas on a part of the large area of land covered by the mineral reservation made by the Louisiana Central Oil and Gas Company on March 15, 1926, but not on the •30 acres owned by Lenard, plaintiff in this suit.' The well was drilled to a depth suf-. ficient to constitute a fair test but was finally abandoned as a dry hole. Thereafter a series of wells were drilled by Zeigen and other mineral lessees of the Louisiana Central Oil and Gas Company - on the large area of land of which the plaintiff’s 30 acres formed a part, but no well was drilled on the plaintiff’s 30 acres. The last of the series of wells drilled on any part of the large area of land, under authority of the mineral reservation made in the sale by the Louisiana Central Lumber Company to the Brown Paper Mill Company, dated March 15, 1926, was being drilled by or for one of the defendants in this suit, Shell Oil Company, Inc., at the time of the trial of this case.
 

 ■The question presented for decision- by this statement of facts is whether the min
 
 *272
 
 eral rights in the 30 acres of land owned by the plaintiff were in the possession of the plaintiff or in the possession of the defendants at the time when this suit was filed.
 

 The plaintiff sets forth four propositions as the basis for his suit; all of which propositions were rejected by the trial judge, and are listed in his reasons for judgment, as follows: (1) That it is against public policy to permit the reservation or creation of a mineral servitude on so vast an area of land as 80,000 acres; (2) that the well drilled by the lessee, Zeigen, which was commenced on December 20, 1935, was not drilled to a depth sufficient to constitute evidence of good faith in the exercise of the mineral servitude reserved by the Louisiana Central Lumber Company in its transfer of the land to the Brown Paper Mill Company on March 15, 1926; (3) that the drilling of the wells by the defendants or their lessees did not constitute an exercise of their mineral servitude on the plaintiff’s 30 acres of land because the wells were drilled too far away to affect any oil or gas that might be beneath the surface of the plaintiff’s 30-acre tract; (4) that, even if the defendants acquired possession of the servitude or mineral rights on any portion of the 80,000 acres of land by the drilling of the wells referred to, they did not acquire possession of the servitude or mineral rights on the 30 acres of land owned by the plaintiff, because his possession of the land itself existed from a time previous to the drilling of the wells.
 

 The district judge, having decided against the plaintiff on all of the four propositions enumerated, decided in his favor on ■ the point that his possession of the surface of his 30 acres of land gave him possession also of the mineral rights in the land, notwithstanding the defendants’ drilling operations on other parts of the large area covered by their servitude.
 

 A question similar to the one presented in this case was presented in the case of International Paper Company v. Louisiana Central Lumber Company, 202 La. 621, at page 625, 12 So.2d 659, at page 660, where it was said:
 

 “It is well settled — and not disputed — that a jactitation suit, or an action for slander of title, can be maintained only by one who is in actual possession as owner, and only against one who is not in possession, of the property the title to which is sought to' be quieted. [Citing several decisions.]”
 

 In the same case, 202 La. at pages 626, 627, 12 So.2d at page 660, it was declared:
 

 “The only question in this case therefore is whether the plaintiff, International Paper Company, was in actual possession as owner of the mineral rights in dispute, — and consequently whether the defendant, Louisiana Central Oil & Gas Company, was not in adverse possession of these rights — at the time when this suit was filed.”
 

 
 *274
 
 So it is here. The question is whether the plaintiff, by virtue of his possession as owner of the surface of the 30 acres of land, was in adverse possession also of the mineral rights in the land, or whether the defendants, by exercising the mineral servitude by means of their drilling operations on parts of the land, were in possession of their servitude on the whole tract at the 'time when this suit was filed.
 

 On the facts of the case, the defendants were in actual possession of the mineral servitude, according to the provisions of the Civil Code and the jurisprudence on the subject. On that subject we quote again from International Paper Company v. Louisiana Central Lumber Company, 202 La. at pages 632, 633, 12 So.2d at page 662—thus:
 

 “Mineral rights and mineral leases are by Act [No.] 205 of 1938 ‘defined and classified as real rights and incorporeal immovable property,
 
 and may be
 
 asserted,
 
 protected and defended in the same manner as may be the ownership or possession of other immovable property by the holder of such rights.’
 
 It is declared in article 3432 of the Civil Code that possession of incorporeal property, such as servitudes, is had by the exercise of such rights. See Connell v. Muslow Oil Co., 186 La. 491, 172 So. 763; Allison v. Maroun, 193 La. 286, 190 So. 408; and In re Mt. Forest Fur Farms of America, Inc., 122 F.2d 232, where the United States Circuit Court of Appeals for the Sixth Circuit reviewed extensively the law of Louisiana recognizing that mineral rights are subject to
 
 actual possession,
 
 adverse to the possessor of the land itself,
 
 by the exercise of such rights.”
 
 [Italics are ours.]
 

 The four points urged by the plaintiff, and referred to heretofore, have reference to the validity of the servitude or mineral rights reserved by the Louisiana Central Lumber Company in the sale to the Brown Paper Mill Company on March 15, 1926. The first of these points is that the reservation of the mineral rights, or a mineral servitude, on a tract of land having an area as great as 80,000 acres is against public policy. We agree with the district judge that there is no such public policy as the plaintiff invokes. The argument is that a sale or reservation of a mineral servitude on such a large area of land tends to keep the minerals or mineral rights out of commerce. On the contrary, as everyone knows, the production of mineral oil or gas is such an expensive operation that it cannot be done profitably on a small scale. No one would undertake to drill for oil or gas in unproven territory — what is called a wildcat well — without owning or controlling the mineral rights on a vast area surrounding the prospective well. As a matter of fact, it appears from the maps filed in evidence in this case that the 80,000 acres on which the Louisiana Central Lumber Company reserved the mineral rights in the sale to the Brown Paper Mill Company on March 15, 1926, consists of
 
 4
 
 separate
 
 *276
 
 tracts, and that the tract which embraces the 30 acres of land owned by the plaintiff and involved in this suit contains not 80,000 but 20,000 acres. That, however, is of little or no importance in the light of the jurisprudence on this subject of public policy. For example, in the case of Patton v. Frost Lumber Industries, 176 La. 916, loc. cit. 922, 147 So. 33, loc. cit. 34, a mineral servitude covering 30,000 acres was dealt with — without condemnation — thus: 1
 

 “The servitude created by Frost-Johnson Lumber Company on January 12, 1917, in favor of the Federal Petroleum Company, and which has passed by mesne conveyances to the present owners, covered this entire 30,000-acre tract. Every 40-acre subdivision of it, including the lands now owned by plaintiffs, was incumbered by that servitude the moment it became effective between the grantor and the grantee. From that moment the grantee and its assigns were vested with the absolute right to develop for minerals all or any part of the land. * * *
 

 “The owners -of this servitude did exercise it by drilling and producing gas within the ten-year period. While no well was ever drilled on the particular land owned by these plaintiffs, yet at least ten producing gas wells have been drilled on other portions of this large continuous tract, eight of which-within ten years from the date on which the Federal Petroleum Company acquired its servitude on January 12, 1917. The nearest producing well to plaintiff's property is approximately three miles. The others are from- four to ten miles away. But, as we have stated, they are all on the same continuous tract of land of which plaintiffs’ lands form a part.
 

 “In Lee et al. v. Giauque, 154 La. 491, 97 So. 669, we held that the exercise of a servitude on any part of a continuous tract of land where the servitude covers the whole tract preserves the servitude on the entire tract; the reason being that there is but one servitude.”
 

 In the case of Mt. Forest Fur Farms of America, Inc., v. Cockrell, 179 La. 795, 155 So. 228, the court recognized a mineral servitude covering a tract of land having an area of 52,500 acres, without any suggestion that a mineral servitude on so large an area was violative of a public policy.
 

 In the case of Frost Lumber Industries v. Republic Production Company, 112 F.2d 462, loc. cit. page 465, Judge Hutcheson for the Circuit Court of Appeals for the Fifth Circuit, citing Louisiana decisions, said:
 

 “A grant of minerals creates as many separate servitudes as there are separate tracts of land involved; but, as to each continuous and contiguous tract, regardless of its size, there exists but one servitude; and the exercise of the servitude upon any part of such tract preserves the servitude as to the whole tract.”
 

 We agree with the finding of the district judge that the wells drilled by Zei
 
 *278
 
 gen were drilled to a sufficient depth and at a sufficient cost to show that they were drilled in good faith and constituted a fair and reasonable exercise of the mineral servitude. The record shows that Zeigen drilled 15 wells on the area which was covered by the mineral servitude. He was an experienced driller for oil and gas, having been engaged in the business for 16 years. He had so much faith in his efforts to produce oil or gas in this instance that he lost his fortune in the drilling of the wells under his lease from the Louisiana Central Oil and Gas Company. The depth to which Zeigen drilled complied with our latest definition of what constitutes a good-faith test in a case like this. The definition appears in International Paper Co. v. Louisiana Central Lumber Co., 202 La. 621, 12 So.2d 659, 661, as follows:
 

 “The Louisiana Central Oil & Gas Company, through a lessee, commenced drilling a well for oil or gas on the smaller tract on November 1, 1929, and drilled beyond the depth at which any oil or gas had been produced in the nearest oil or gas field. The well was completed and abandoned as a dry hole on November 24, 1929; but the completion of the well was a fair test on the part of the Louisiana Central Oil & Gas Company.”
 

 The plaintiff’s next point is that Zeigen’s drilling of the well which was commenced in December 1935 was too far away from plaintiff’s 30-acre tract to have affected any oil or gas beneath the surface of that tract if the well had produced oil or gas. A sufficient answer to that argument is that the extent of the exercising of a mineral servitude hqs nothing to do with the question as to how far away the drilling operations can affect the oil or gas beneath the surface of the land. The well which 'was drilled by Zeigen in December 1935 was about 5 miles distant from the plaintiff’s 30-acre tract, according to the finding of the district judge; but, according to the jurisprudence that distance is a matter of no importance so long as the drilling was done on' the continuous tract of land which was covered by the mineral servitude re.served by the Louisiana Central Lumber Company and which included the 30-acre tract owned by the plaintiff in this suit. The area described in the contract creat7 ing a mineral servitude is what determines the extent to which drilling operations on any part of the tract shall preserve the servitude. That rule is applicable not only to the prescription of 10 years liberandi causa but also to the prescription of 10 years acquirendi causa, by which the owner of a servitude may lose it.
 

 The subject of separate possession of a mineral servitude by the owner thereof, adverse to the possession held by the owner of the land, was presented to this court for the first time in the case of Connell v. Muslow Oil Company, 186 La. 491, 172 So. 763, 764. In that case Connell claimed that he had acquired by the prescription of 10 years acquirendi causa the mineral rights
 
 *280
 
 in 40 acres of land which he owned and possessed. The land was the north 40 acres of an 80-acre tract in which the defendant, Muslow Oil Company, owned the mineral rights. The 80-acre tract was owned originally by the Natalie Oil Company, who owned also all of the minerals or mineral rights in the 80 acres and owned also a producing well which the company had drilled on the southern 40 acres. The company sold the 80 acres to a corporation named Wilier, Marks & Gamm but reserved from the sale all of the mineral rights in the 80 acres and the producing well on the south 40 acres, and the machinery and equipment belonging thereto. The reservation was stated in the act of sale which was recorded promptly. Wilier, Marks & Gamm after-wards sold to Sam Wilier and Julius Gamm the north 40 of-the 80 acres, without mentioning in the deed that the mineral rights in the land had been reserved by the Natalie Oil Company. Wilier and Gamm afterwards sold the north 40 acres to W. E. McDade without reserving or mentioning the previous reservation of the mineral rights. McDade sold the north 40 acres to Connell, without reserving or mentioning the reservation of the mineral rights. No drilling operations were conducted on the north 40 acres owned by Connell. After he had been in actual possession of the surface of that part of the land for more than 10 years he claimed title to the mineral rights in his 40 acres by the prescription of 10 years acquirendi causa. Meanwhile, however, the Natalie Oil Company and its successors in title had retained possession of the mineral rights or mineral servitude on the 80 acres of land by the drilling operations conducted on the southern half of the tract. In deciding that these mineral operations by the Natalie Oil Company and its successor in title had prevented the plaintiff from acquiring title to the mineral rights in the northern 40 acres by the prescription of 10 years acquirendi causa, the court said:
 

 “No well was drilled on the N. W. 14 of S. E. °f Sec. 10 during the period exceeding seventeen years after Connell bought the land. The Natalie Oil Company and its successors in title, however, have retained possession of the mineral rights, or servitude, on the whole 80 acres of land, in the only way that the law provides for the exercise of the right of possession of a servitude, or an incorporeal right. Article 3432 of the Civil Code provides :
 

 “ ‘The possession of incorporeal rights, such as servitudes and other rights of that nature, is only a quasi possession, and is exercised by the species of possession of which these rights are susceptible.’ ”
 

 After discussing at length the facts which showed that the Natalie Oil Company’s possession of the mineral rights by their operations, on the south 40 acres was open and observable to the public, the court said:
 

 “Whether Connell did or did not actually know that the Natalie Oil Company owned
 
 *282
 
 the mineral rights in the 80 acres of land,' at the time when Connell bought the northern 401 acres from McDade, is a matter of no importance, in our view of the case. The important fact is that the Natalie Oil Company and its successors in title, by exercising their mineral rights, or' servitude, upon a part of the 80 acres of land, protected the servitude on the whole 80 acres against loss by prescription.
 

 í]{ í{< ‡
 
 *
 

 “The rule of law that controls this case is that the exercise of the mineral rights, ■&r servitude, on any part of one continuous tract of land upon which the servitude is imposed is considered an exercise of the right on the whole tract.”
 

 It would be impossible to reconcile the judgment appealed from in this case with the decision rendered in Connell v. Muslow Oil Company. In each case the owner of the surface of a part of a tract of land which was affected by a mineral servitude in favor of a third party held possession of his part of the land, under a deed in which there was no mention of the fact that the mineral servitude belonged to the other party. In each case mineral operations were conducted on a part of the larger area, of which the surface owner’s land formed a contiguous part, but no operations were conducted on his part of the land. In the Connell Case the court held that the riiining operations conducted by the owner of'the servitude on a part of the land protected the servitude against loss by prescription acquirendi causa as to any and all of the land affected by the servitude. And so in this case, the drilling operations conducted on a part of the large contiguous area, by the owners of the servitude on the whole tract, protected their title to the servitude on the whole tract against the prescription of 10 years acquirendi causa, pleaded by the plaintiff as owner and possessor of the 30 acres forming part of the tract affected by the servitude.
 

 In the case entitled In re Mt. Forest Fur Farms of America, Inc., 122 F.2d 232, 239, the U.S.C.A. for the Sixth Circuit had before it the question of possession of a mineral servitude separate from and adverse to the possession by the owner of the surface of the land affected by the servitude. The trustee in bankruptcy for the Mt. Forest Fur Farms of America, claiming the mineral rights or mineral servitude on a contiguous tract having an area of 52,500 acres, in Louisiana, impleaded in the United States District Court for the Eastern District of Michigan several parties claiming mineral servitudes aid mineral leases on the land in order that they might litigate their conflicting interests in the mineral rights. On appeal to the United States Circuit Court of Appeals for the Sixth Circuit the court discussed the bankruptcy law and concluded that possession of the servitude or mineral rights in the land whs the determining factor upon' which de
 
 *284
 
 pended the question of jurisdiction of the court. The author of the opinion stated the questions thus:
 

 “Does the res in controversy here consist of mineral rights or servitudes susceptible of separate ownership and possession apart from the ownership and possession of the surface of land?
 

 “Does the exercise of a mineral right or servitude-by extracting and actually posses- . sing the minerals from land constitute possession of the right or servitude?
 

 “To determine the issue of jurisdiction, these questions must be answered in accordance with Louisiana law.”
 

 After reviewing the Louisiana law on the subject, and quoting extensively from the opinion in Connell v. Muslow Oil Company, 186 La. at pages 494, 496, 172 So. at pages 764, 765, and the case of Allison v. Maroun, 193 La. 286, 190 So. 408, 410, the court declared that the decisions had settled the pioposition that the owner of a mineral servitude, by conducting drilling operations on the land held possession of the servitude, adverse to the owner and possessor of the land itself. That decision was cited with approval by this court in the case of International Paper Company v. Louisiana Central Lumber Company, 202 La. 621, 12 So.2d 659, as we have shown by our quotation from the opinion in the latter case.
 

 It appears that the error in the judgment appealed from is in the omission to observe that the ownership of the mineral rights in the 30 acres of land owned and possessed' by the plaintiff had been severed from the ownership of the land itself, and hence that the mineral servitude was subject to possession and was in fact possessed by the owner thereof adversely to the owner of the 30 acres of land. The judge in his written opinion in this case recognized that the servitude on the larger tract of land embracing the 30 acres was one indivisible servitude, and that the servitude was exercised and possessed by the drilling operations conducted by the defendants. The judge erred however in his conclusion that, so far as the plaintiff’s 30 acres of land was concerned, the defendant’s possession of the servitude on the entire tract that was subject to the servitude was only a constructive possession and therefore could not prevail against the plaintiff’s actuál possession of the 30 acres of land. That conclusion resulted from overlooking the difference between a case where the ownership of the mineral rights has been severed from the ownership of the land itself, and a case where there is no such severance or dismemberment of the ownership of the mineral rights and the ownership of the land itself. That distinction is settled by the de7 cisión in Connell v. Muslow Oil Company, In re Mt. Forest Fur Farms of America, and International Paper Company v. Louisiana Central Lumber Company, from all of which we have quoted in this opinion.
 

 Counsel for the plaintiff undertakes to distinguish this case from the case of Connell v. Muslow Oil Company by the
 
 *286
 
 fact that in the latter case the Natalie Oil Company was exercising its servitude and hence had possession of the mineral rights before and at the time when Connell bought and went into possession of his 40 acres of land; whereas, in the present case the plaintiff bought and went into possession of his 30 acres of land before the defendants commenced drilling operations on another part of the whole tract which was covered by the mineral servitude and which included the plaintiff’s 30 acres of land. Those facts do not distinguish the cases so far as the law is concerned. In both cases the owner of the soil had actual possession of it and the owner or owners of the mineral servitude held actual possession of the servitude by the drilling operations. In Connell v. Muslow Oil Company, as in the present case, the plaintiff cited and relied upon the decision in Palmer Corporation of Louisiana v. Moore, 171 La. 774, 132 So. 229, and Sample v. Whitaker, 171 La. 949, 132 So. 511. Both of those cases are discussed in the opinion rendered in Connell v. Muslow Oil Company, where we pointed out that the decisions in those cases were not applicable to Connell v. Muslow Oil Company because the owner of the mineral servitude had not exercised his incorporeal light by drilling wells on the land. The discussion of the two previous decisions in the Connell Case shows plainly that it makes no difference, in a case where the mineral rights in a tract of land are owned separately from the land itself, whether the possession held by the owner of the land commenced before or after the possession commenced by the owner of the mineral rights by his exercising his rights by conducting mining operations on the land. On that subject, we said in the Connell case, 186 La. at page 499, 172 So. at page 766, this:
 

 “The opinion which was rendered in the case [Palmer Corporation v. Moore] shows plainly that Moore’s plea of prescription of ten years acquirendi causa would have been unavailing if the owner of the mineral rights, or servitude, on the tract No. 3, containing 280 acres, of which the eastern 80 acres belonged to Moore, had exercised the right by drilling a well on any part of the 280 acres within the ten years.”
 

 And later in the opinion rendered in Connell v. Muslow Oil Company, 186 La. at page 500, 172 So. at page 766, the court referred to Sample v. Whitaker, thus:
 

 “But, if the Samples had possessed their servitude, by the exercise of it, as provided in article 3432 of the Civil Code, Whitaker’s possession of the land would not have been an adverse possession, and the prescription of ten years acquirendi causa would have been unavailing.”
 

 Our conclusion is that the exercise of the mineral servitude by the defendants or their lessees by drilling in search of oil or gas on a part of the larger tract of land which was affected by the mineral servitude and which embraced the 30 acres owned and possessed by the plaintiff in this case prevented him from acquiring the
 
 *288
 
 mineral rights on his 30 acres by the prescription of 10 years acquirendi causa, notwithstanding none of the drilling operations were conducted on his 30 acres of land.
 

 The judgment appealed from is annulled and reversed and the plaintiff’s demand is rejected and his suit dismissed at his cost.
 

 HAMITER, J., concurs in the decree.