HAWTHORNE, Justice.
 

 Plaintiffs, Bunyan J. Johnson, Clarence E. Swanson, Mrs. Beulah Johnson Mason, and Jim McMurrey, instituted this suit praying that they (other than McMurrey) be recognized as the owners of all mineral rights in a tract of land situated in Caddo Parish, containing 498.21 acres, subject to a valid oil and gas lease made by them to Jim McMurrey, and that the defendants be enjoined from slandering their title and from interfering with the exercise of the mineral servitude through the operations of McMurrey under the lease.
 

 Defendants, Wilbur P..Gray and his wife, Mrs. Ruby Gillespie Gray, and Barney C. Hickey and his wife, Mrs. Willie Mae Perryman Hickey, contend that they are the owners of all the minerals in the property by virtue of the prescription liberandi causa, and in the alternative that, should the court hold that the operations by Mc-Murrey, plaintiffs’ lessee, were sufficient to constitute a good faith attempt to obtain production, they should nevertheless be recognized as the owners of an undivided 278.035/498.21 interest in and to the minerals, as servitudes representing this proportion of the mineral interest had expired by nonuse before McMurrey started operations under the lease.
 

 The district court held that the plaintiffs Johnson, Swanson, and Mrs. Mason were the owners of an undivided 220.175/-498.21 interest in the oil, gas, and other minerals under the tract, .since the drilling operations of McMurrey were a bona fide attempt to obtain production and interrupted the running of the prescription, and granted unto plaintiffs an injunction permanently enjoining defendants from interfering with the further and continued exercise of the right of plaintiffs under the mineral servitude and the oil, gas, and mineral lease. From this portion of the judgment the defendants have appealed. The judgment of the district court also held that the alteimative plea of defendants was well founded, and that they were the owners of the fractional interest claimed in their alternative demand, clear and free of the McMurrey lease. Plaintiffs have answered defendants’ appeal, praying that they be recognized as the owners of all the minerals in the property.
 

 On March 26, 1936, the Continental American Bank & Trust Company, fee simple owner of this tract of land, conveyed it by warranty deed to Bunyan J. Johnson and Clarence E. Swanson, two of the plaintiffs, reserving to itself an undivided one-half of all the minerals. Thereafter, between May 21 and May 25, 1936, Johnson and Swanson by six separate mineral sales sold a portion of the mineral interest which they had obtained from the bank. A little more than year after their
 
 *909
 
 acquisition, that is,
 
 on March 29,1937,
 
 Johnson and Swanson conveyed the tract to the defendants by warranty deed which contains the following clause: “It is expresly stipulated and agreed that vendors reserve unto themselves all of the oil, gas and other minerals, in, to and under the property hereinabove described, together with all rights of ingress and egress upon and over said-property for the purpose of going upon the same, exploring and developing the same for the purpose of removing oil, gas and other minerals therefrom.”
 

 For the purpose of clarity, we here point out that the undivided 220.175/498.21 interest in the oil, gas, and other minerals, recognized to be in plaintiffs (other than McMurrey) by the judgment of the lower court, is the interests of Mrs. Beulah Johnson Mason and the interest of Johnson and Swanson remaining unsold by them at the time they conveyed the land to defendants herein on March 29, 1937; and that the 278.035/498.21 interest, which the lower court held reverted to the defendants since the servitudes as to it expired in 1946 by nonuser for. a period of 10 years, is composed of the one-half interest reserved by the Continental American Bank & Trust Company and the total interest in tfye six mineral sales made by Johnson and Swanson to various vendees.
 

 All parties to this suit admit and agree that the mineral servitudes of the Continental American Bank & Trust Company and the six vendees of Johnson and Swanson have expired by nonuse since no well was drilled on the property within 10 years from the dates of the creation of the servitudes in 1936. Plaintiffs Johnson and Swanson take the position that upon the expiration of these servitudes in 1946 the minerals conveyed or reserved by these various instruments reverted to them under the above-quoted reservation, although at that time the land was owned by the defendants herein. Plaintiffs contend that the drilling of the well on the premises by the lessee, McMurrey, as hereinafter set forth, was a bona fide attempt to produce oil and gas from the property and was an exercise of the servitudes of Johnson, Swanson, and Mrs. Mason, and interrupted prescription before it accrued on March 29, 1947.
 

 The trial judge in his well written reasons for judgment concluded that the servitudes of the Continental American Bank & Trust Company and of the six vendees of Johnson and Swanson had reverted to the defendants, the owners of the land. We think this conclusion is correct, and we quote and adopt as our own his reasons therefor, in part, as follows: ■
 

 “In determining who owned the minerals under said land on February 26, 1947, the date of the McMurrey lease, it becomes necessary to decide to whom inured the one-half of the minerals reserved by the bank in its sale to Johnson and Swanson on March 26, 1936, and the fractional mineral
 
 *911
 
 interests sold by Johnson and Swanson in the six mineral deeds executed by them between May 21st and May 25th, 1936. It is not denied that these servitudes were lost by nonuser for ten years and defendants plead the prescription of ten years liberandi causa. The plea is good and is sustained.
 

 “It is plaintiffs’ contention that, upon the lapsing of the mineral servitudes created by the reservation and the mineral sales referred to in the preceding paragraph, said mineral rights inured to Johnson and Swanson under the reservation in their deed to defendants on March 29, 1937, which reservation we quoted in the beginning of the opinion, because, by thus reserving ‘unto themselves’ all the minerals under the land, Johnson and Swanson, reserved ‘unto themselves’ all the mineral rights in the land including the ‘reversionary rights’ to the minerals covered by said servitudes. 'On the other hand, defendants contend that the mineral rights covered by said mineral servitudes reverted to them as the owners of the land at the time of the lapsing of said servitudes.”
 

 The trial judg’e pointed out that this question was settled in the recent case of Gulf Refining Co. v. Orr et al., 207 La. 915, 22 So.2d 269, 270, in which the case of McDonald v. Richard et al., 203 La. 155, 13 So.2d 712, was compared and discussed. He then quoted the following extract from the Orr case:
 

 “The question involved in this case cannot be distinguished in principle from the question involved in the case of McDonald v. Richard * * *. In that case, this court held that where the owner sold his land but reserved the mineral rights and the purchaser of the land sold the mineral rights to which he had no title, and later sold the land, when the original vendor of the land lost his mineral servitude by the liberative prescription of ten years for nonuser, the lapsing of the servitude inured to the party owning the land when the obligation lapsed.
 

 “If the owner of the land incumbered with a mineral servitude cannot create another servitude thereon by the sale of the same mineral rights, which he does not own, it logically follows that neither can he create another mineral servitude on the land by a reservation in the deed of sale of the same mineral rights which he does not own.”
 

 The trial judge went on to say:
 

 “To hold otherwise would mean, as Chief Justice O’Niell pointed out in McDonald v. Richard, that a landowner may impose an interminable series of mineral servitudes Upon his land by making a series of sales (■or reservations) of the same mineral rights, with the stipulation or understanding that each servitude thus imposed upon the land would take effect only when and if the previously imposed servitude or servitudes should become extinguished by the liberative prescription of 10 years.
 

 “But plaintiffs argue that Johnson and Swanson, by the reservation in their
 
 *913
 
 deed to defendants, reserved ‘unto themselves’ not only all the minerals they then owned, but, also, intended to reserve, and by the language of the reservation, did actually reserve ‘unto themselves’ the ‘reversionary rights’ to the minerals then outstanding and owned by others. And they point out that the Supreme Court said in Gailey v. McFarlain, 194 La. 150, 193 So. 570, that the reversionary mineral interest of the owner of the fee simple title is ‘a certain object’ which can be legally sold. True, that was said, but, as was pointed out in McDonald v. Richard, and we quote the opinion of the Court:
 

 “ ‘* * * all that was decided in Gailey v. McFarlain was that the owner of a certain tract of land that was subject to a mineral servitude did not afterwards sell his so-called “reversionary rights,” or “reversionary interest,” in the mineral rights which he had previously sold.’
 

 “In other words, all that the Court did in Gailey v. McFarlain was to interpret the language of the deed therein involved and concluded,
 

 “ ‘It is our opinion that there was no sale or grant in praesenti of McFarlain’s reversionary mineral interest in the Triche deed dated July 20, 1926.’
 

 l}C 5-C ‡ íjí H*
 

 “Applying these approved principles to the reservation in the deed from Johnson and Swanson to these defendants, it seems clear to us that Johnson and Swanson did not * * * reserve their so-called reversionary rights to the then outstanding mineral interest. * * *
 

 “It is our opinion that the one-half of the minerals reserved by the Bank in its sale to Johnson and Swanson on March 26, 1936, and the fractional mineral interest sold by Johnson and Swanson in the six mineral deeds executed by them between May 21st and May 25th, 1936, reverted to and revested in defendants at the expiration of 10’ years from the dates of said sales. And, since defendants did not sign the Mc-Murrey lease of February 26, 1947, they own such interest free of said lease.
 

 “The reservation in the deed from Johnson and Swanson to these defendants on March
 
 29,
 
 1937, did reserve to Johnson and Swanson the remainder of the minerals which had not theretofore been reserved or sold and created in favor of Johnson and Swanson a servitude on said remainder. Thereafter, on April 6, 1937, Mrs. Mason acquired from Johnson and Swanson an undivided 50/726 of the minerals in the 498.21 acre tract.
 

 “Thus on February 26, 1947, defendants owned an undivided 278.035/498.21 interest (this fraction is the computation of counsel for defendants and its correctness is not questioned by plaintiffs) in the minerals, Mrs. Mason owned an undivided 50/726 interest in the minerals and Johnson and Swanson owned the undivided remaining interest in the minerals. * * * ”
 

 
 *915
 
 We might further point out that the trial judge’s conclusion is supported by the recent decision of this court in Long-Bell Petroleum Co., Inc., et al. v. Tritico, 43 So.2d 782, in which this court pointed out that, in order for one making a reservation of a mineral right thus to create a new servitude, the one making the reservation must of necessity be the owner of the right at the time the reservation is made.
 

 There now remains for our consideration the question of whether the ..drilling operations of McMurrey were a user of the servitude so that the prescription of 10 years liberandi cause was in- ' terrupted as to the servitude created by plaintiffs’ reservation in their deed to the defendants, which prescription accrued on ' March 29, 1947, unless so interrupted.
 

 On February 26, 1947, an oil, gas, and .mineral lease was executed by Johnson, Swanson, and Mrs.- Beulah Johnson Mason to Jim McMurrey. The consideration recited in this lease was $100.00 and the obligation on the part of the lessee to commence actual drilling operations on the property on or before March 28,1947, for the production of oil and gas.
 

 After the execution of this lease, the lessee, McMurrey, obtained a permit from the Conservation Department to drill a well on this tract of land to the
 
 Nacatosh
 
 sand or zone. After the’ construction, of a plank or tram road to the well site, the lessee on or about March IS, 1947, moved to the site a portable drilling rig. Photographs of this rig were filed in evidence, and from these pictures it appears that the power necessary .for drilling operations was furnished to this rig by a motor mounted on the rear of a large truck, and that the construction of a derrick was unnecessary.
 

 Actual' drilling operations started on March 16, 1947, and continued until March 26. By these operations a well, designated as McMurrey No. 1, was drilled to the Nacatosh sand, which, according to numerous witnesses, is found at a depth of between 900 and 1000 feet, but no production was obtained in this sand or zone. Thereafter McMurrey’s men began to remove the drilling equipment from the premises, and by March 28 only the pipe in the hole and the plank road which had been constructed remained on the premises. Since production had not been obtained in the Nacatosh sand, an application dated March 31, 1947, was made to the Department of Conservation for an amended permit to drill to the Travis Peak zone or sand, and it was subsequently granted. In the last days of March or about the first of April, the lessee, McMurrey, entered into an oral contract with J. D. Baker to deepen the well to the Travis Peak zone, found at approximately 6000 feet in this area. Baker was in the drilling business and owned drilling equipment, including the necessary derrick to drill to a depth of 9000 or 10,-000 feet, which was only about four or
 
 *917
 
 five miles away from this tract. In order to move this heavy rig onto the premises, it was necessary to repair the plank road which had been constructed on the property, and, when McMurrey sent his men for this purpose to the premises on or about April 4, they discovered that the gateway through which entrance was made onto the leased premises was fenced up, with 'a sign thereon reading: “Gray & Hickey Estate. Stay Out.” This gate had been closed and the sign placed thereon by defendant Hickey on April 2, 1947. McMurrey sent his employees to talk with Hickey about going back on the land, but they were forbidden to re-enter. Plaintiffs then on April 15, 1947, filed the instant suit.
 

 We cannot agree with the holding of the lower court that the drilling operations of McMurrey to the Nacatosh sand, in themselves alone, constituted a bona fide attempt to obtain production from that stratum and interrupted the running of the prescription liberandi causa.
 

 As this court has pointed out, no iron-clad rule can be established .to determine whether there has been a use of such a servitude to interrupt prescription. But it may be said that, where exploitation or drilling operations have been begun but have been stopped or abandoned at a depth at which there is no reasonable hope of discovering minerals in paying quantities, there has been no user of the servitude to interrupt prescription. In other words, the drilling of the well and the exploitation must be in good faith with reasonable expectation that the well will be a' producer. Keebler et al. v. Seubert et al., 167 La. 901, 120 So. 591; Louisiana Petroleum Co. v. Broussard et al., 172 La. 613, 135 So. 1; Hunter Co., Inc., v. Ulrich, 200 La. 536, 8 So.2d 531.
 

 The well in the instant case was drilled in the area of the Waskom field, and there were some seven or eight strata which had produced in this area. These strata vary in depth from 900 feet, the Nacatosh sand, to approximately 6000 feet, the Travis Peak. According to defendants’ Exhibit 13, a map revised by the Globe Map Company to show the location and ownership of the various wells surrounding this tract, there were numerous depleted and abandoned wells which had been drilled to the Nacatosh sand. The record discloses that the last Nacatosh wells were drilled in the area during the early 1930’s and produced for only a short time, and that there were no wells producing from this sand in the vicinity of the McMurrey location. The closest producing well to the property, which produced from the Travis Peak at around 6180 feet, was located approximately two miles south of the McMurrey location.
 

 McMurrey testified that he had a reasonable expectation of securing commercial production from the Nacatosh sand, and that this expectation was based primarily on a map prepared by a geologist, which
 
 *919
 
 indicated a closure or high on the property, and, further, on the fact that there had been three or four wells producing from the Nacatosh sand scattered at a distance of some 15 miles around his location. The geologist who made the map testified that he knew nothing of the development of this area for oil and gas; that he was not familiar with the history of the Nacatosh production in the area; that he merely superimposed the sub-surface structure on a surface map, which he prepared from the logs of wells drilled in the area. The testimony of this witness, as well as that of another expert called by plaintiffs, as to the probability of obtaining production in the Nacatosh sand is, to say the least, unconvincing. Defendants called numerous oil men with long experience who had worked in the Waskom field for many years. A fair analysis of their testimony convinces us that there was no reasonable possibility of plaintiffs’ obtaining production from the Nacatosh sand, as this sand had long since been depleted. It is thus shown by a preponderance of the evidence that McMurrey himself could not have reasonably expected to obtain production from the Nacatosh sand, and that the drilling of the well to this sand only did not interrupt prescription.
 

 In brief filed in this court plaintiffs state that their position, taken in the pleadings, at the trial, and in this court, “has always been not that McMurrey went on the land to drill a Travis Peak test primarily, but his intention was to drill a Nacatosh well, and only if it was non-productive he would go to the Travis Peak horizon, found at approximately 5900 to 6000 feet in this area”, and that, in the event that this court should hold that the drilling of this well to the Nacatosh sand “was not an effective exercise of the servitude, then plaintiffs clearly intended to drill to a deeper horizon and were in the act of doing so when physically restrained by the defendants. They should be permitted to continue the deeper drilling, and the injunction against the defendants should be maintained”. We think that the evidence supports plaintiffs’ position.
 

 The record reveals that, during McMurrey’s drilling operations, he set 253 feet of 10%-inch casing in the well, and that, if he had intended only to drill to the Nacatosh sand, one or two joints of eight-inch casing would have been sufficient; that, with the amount of 10%-inch casing set, the well could be reworked to be drilled to the Travis Peak horizon; that at the beginning of the operations he purchased a sufficient amount of pipe and tubing for a Travis Peak test; that, instead of cementing and plugging the well as required by the Conservation Department for abandoned wells, he capped the well with a bull plug, which could be unscrewed and removed so that further drilling could be continued; that, only a few days after the removal of the portable drilling rig, he entered into an oral contract with.J. D. Baker, a drill
 
 *921
 
 ing contractor and the owner of a large steam rig capable of drilling to the Travis Peak, to deepen the well to that zone at a cost of $4.85 per foot; that application was made on March 31 to the Conservation Department for a permit to drill to the Travis Peak sand; that on or about April 4 Mc-Murrey sent his men to the premises to repair the plank road so that the heavy drilling rig could be moved to the site, and that they were not permitted to re-enter the premises by the defendants, who had closed and posted the entrance to the well site.
 

 In the light of these facts and circumstances, it is clear that McMurrey never intended to abandon, nor did he abandon, his drilling operations, and that, when he was barred from the premises by the defendants, he was engaged in the preparation to continue deeper drilling. The defendants should therefore be enjoined from interfering with the drilling of the well Mc-Murrey No. 1 to deeper horizons, and plaintiffs should be permitted to continue their efforts to interrupt prescription by these drilling operations. For the purpose of so continuing plaintiffs should be, and are, granted a reasonable time to resume these operations.
 

 Since we have concluded that the drilling of the well only to the Nacatosh sand was not a valid user of the servitude of plaintiffs and did not interrupt prescription, the judgment of the lower court recognizing such use as an interruption of prescription must be reversed.
 

 For the reasons assigned, the judgment of the district court fixing the ownership of the respective mineral interests of all parties to this suit is affirmed. In all other respects the judgment is reversed and set aside. It is now ordered that plaintiffs be permitted to continue with the drilling of the well McMurrey No. 1, and that defendants 'be enjoined from interfering with such drilling to deeper horizons, plaintiffs to resume such drilling within a reasonable time. It is further ordered that one-half of the costs of these proceedings be paid by plaintiffs and one-half by defendants.