131 So.2d 578 (1961)
KELLOGG BROS., INC., et al., Plaintiffs-Appellants,
v.
SINGER MANUFACTURING COMPANY et al., Defendants-Appellees.
No. 9536.
Court of Appeal of Louisiana, Second Circuit.
June 16, 1961.
Rehearing Denied July 7, 1961.
*579 Theus, Grisham, Davis, Leigh & Brown, L. E. Hayden, III, Monroe, for appellants.
Tucker, Bronson & Martin, Shreveport, Sevier, Yerger & Sevier, Tallulah, for appellees.
Before HARDY, GLADNEY and AYRES, JJ
GLADNEY, Judge.
Kellogg Brothers, Inc., instituted this suit to obtain cancellation of a mineral servitude and an oil and gas lease covering certain of its lands in the Parish of West Carroll, Louisiana. Made defendants were Singer Manufacturing Company, the purported servitude owner, and its mineral lessee, Atlantic Refining Company.
By deed dated April 28, 1941, Kellogg Bros., Inc., acquired from Singer Manufacturing Company five non-contiguous tracts of land, consisting of some 4,885.95 acres, in West Carroll Parish. The deed contained a reservation by Singer of all minerals and mineral rights in and upon said lands. In answer to Kellogg's demand letter of November 6, 1958, Singer executed a release of said mineral reservation as to four of the said five tracts, but refused to release it as to the remainder of the lands affected thereby.
On April 3, 1958, Kellogg filed this suit alleging that the unreleased servitude, constituting some 4,040 acres, has, through the accrual of the prescription of ten years liberandi causa, expired for non-user thereof, and that the mineral lease executed by Singer in favor of Atlantic Refining Company on July 19, 1957, should likewise be ordered canceled insofar as it purports to affect the described lands. Petitioner further prayed for attorneys' fees and reservation of its right to seek such damages as it may have sustained by reason of Singer's refusal to release said mineral servitude in its entirety. Defendants filed exceptions of no cause or right of action and of nonjoinder of parties predicated on the grounds that the petition alleged Kellogg had conveyed to various vendees certain of the lands acquired from Singer, but that the petition did not disclose to whom said sales were made, nor the dates thereof. The exceptions were referred to the merits and ultimately overruled. After the filing of said exceptions several of Kellogg's vendees filed petitions of intervention wherein it was alleged that the mineral servitude reserved in the deed from Singer to Kellogg, as well as the servitudes reserved in the deeds from Kellogg to each of the respective intervenors, had expired through the running of ten years non-user prescription. Accordingly, intervenors prayed for recognition of their ownership of the minerals under their respective lands. Kellogg has not contested the claims so asserted.
Defendants answered the petition by asserting that the mineral servitude involved herein has been maintained in force and effect through use thereof, to-wit: (1) the Texas Pacific Coal & Oil Company, operating under a mineral lease from Singer, drilled a well on the servitude to a depth of 6,015 feet, which well was abandoned as a dry hole on March 1, 1946; (2) A. M. Poynter and his assignee, Gustav Muth and/or Luise G. Muth, operating under a mineral lease from Singer, drilled a well on the servitude to a depth of 3,204 *580 feet, which well was completed as a dry hole on September 1, 1955.
Prior to trial, counsel for all parties entered into a stipulation wherein it was agreed: that the tract of land affected by the mineral servitude was one contiguous tract; that the operations conducted by the Texas Pacific Coal & Oil Company constituted an interruption of the liberative prescription accruing against said servitude; and that said operations were abandoned on March 1, 1946, at which time liberative prescription began running anew.
After trial on the merits, the district judge concluded that the drilling operations which terminated on September 1, 1955, constituted a bona fide exercise of the servitude involved, and, therefore, interrupted the running of prescription liberandi causa. Accordingly, there was judgment rejecting the demands of plaintiff and intervenors, whereupon they perfected this appeal.
Appellants contend that the district judge erred in holding that the legal presumption of good faith can satisfy the burden of proof which is placed on the servitudeholder by LSA-C.C. Art. 804 to show such use of the servitude as will interrupt the running of prescription; in holding that defendant Singer has carried the burden of proof imposed by said article to show that it or someone in its name has made use of the mineral servitude here at issue; in holding that the operations shown by defendants with respect to the drilling of the Muth-Singer No. 1 well met with every test for a valid exercise or use of a mineral servitude; and in holding that his findings of fact support his conclusion that the demands of plaintiff and intervenors should be rejected.
The question presented by this cause is whether the 4,040 acre mineral servitude involved herein has expired by reason of non-user prescription. By stipulation it was agreed that the prescription so asserted commenced running on March 1, 1946, the date of abandonment of the Texas Pacific Coal & Oil Company, Singer No. 1 well. Consequently, the servitude became extinguished by the accrual of prescription on March 1, 1956, unless a sufficient exercise thereof occurred within ten years prior thereto. It is the contention of appellees that although there has been no production of oil or gas from the subject property, a sufficient exercise of the servitude was accomplished by the drilling of the Muth-Singer No. 1 well in 1955. Our resolution as to whether the Muth-Singer No. 1 operations constituted an exercise of the servitude will, therefore, be decisive of this appeal.
Appellants' first assignment of error is directed at the significance attributed by the lower court to the legal presumption that the Muth-Singer No. 1 operations were conducted in good faith. Without denying the existence of the presumption [which presumption has been recognized by our courts in Keebler v. Seubert, 1929, 167 La. 901, 120 So. 591 and Lynn v. Harrington, 1939, 193 La. 877, 192 So. 517], appellant nevertheless contends that the district judge erroneously concluded that the presumption discharged the burden of proof imposed upon defendants by LSA-C.C. Article 804, as follows:
"When the prescription of non-usage is opposed to the owner of the estate to whom the servitude is due, it is incumbent on him to prove that he, or some person in his name, has made use of this servitude as appertaining to his estate during the time necessary to prevent the establishment of the prescription."
It is true that the lower court concluded, and we think properly so, that the record does not establish a rebuttal of the legal presumption of good faith. However, contrary to the contentions of appellants, the defendants' good faith was not exclusively relied upon by the lower court as discharging the burden of proof imposed by Article 804. In written reasons for judgment the district judge referred to the circumstances under which the Muth-Singer *581 No. 1 operations were undertaken and determined the operations met every test for a valid exercise or use of a mineral servitude. It is the validity of that holding that is most seriously questioned by appellants, and, in our opinion, constitutes the heart of this controversy.
There are numerous decisions in our jurisprudence wherein the courts have been called upon to determine whether particular drilling operations constituted a user of a mineral servitude. We do not consider it necessary to proceed through a case by case examination of the criteria for such a determination inasmuch as the Supreme Court has summarized the holdings of Keebler v. Seubert, 1929, 167 La. 901, 120 So. 591; Louisiana Petroleum Company v. Broussard, 1931, 172 La. 613, 135 So. 1; Lynn v. Harrington, 1939, 193 La. 877, 192 So. 517; Hunter Company, Inc. v. Ulrich, 1942, 200 La. 536, 8 So.2d 531; International Paper Company v. Louisiana Central Lumber Company, 1943, 202 La. 621, 12 So.2d 659; Lenard v. Shell Oil Company, Inc., 1947, 211 La. 265, 29 So.2d 844; McMurrey v. Gray, 1949, 216 La. 904, 45 So.2d 73; Taylor v. Dunn, 1957, 233 La. 617, 97 So.2d 415, as follows:
"As this court has pointed out, no iron-clad rule can be established to determine whether there has been a use of such a servitude to interrupt prescription. But it may be said that, where exploitation or drilling operations have been begun but have been stopped or abandoned at a depth at which there is no reasonable hope of discovering minerals in paying quantities, there has been no user of the servitude to interrupt prescription. In other words, the drilling of the well and the exploitation must be in good faith with reasonable expectation that the well will be a producer." McMurrey v. Gray, supra at pages 77-78 of 45 So.2d.
We think it clear that the question of whether the Muth-Singer No. 1 operations constituted a user of the subject servitude is a question of fact dependent upon the particular circumstances under which the operations were conducted, and that the factor of good or bad faith on the part of the operators is inextricably connected with, although perhaps not wholly decisive of, the factual situation presented. We, therefore, direct our attention to the events leading up to, and the results obtained from, the drilling of Muth-Singer No. 1.
In the spring of 1955, Mr. A. M. Poynter, an oil and gas man of some twenty years practical experience, was engaged in assembling a block of mineral leases, estimated at 10,000 acres, for himself and Mr. Gustav Muth in the general area of the subject premises. He was approached by a lease broker who suggested that he take a lease from the Singer Manufacturing Company on the 4,040 acres herein involved. Poynter acquired an electrical log of the Texas Pacific Coal & Oil Company well which, as aforestated, had been drilled to a depth of 6,015 feet and abandoned as a dry hole in 1946. In light of his interpretation of the Texas Pacific log, Poynter concluded that there was a reasonable expectation of obtaining gas production from the Singer tract at a depth of about 2,800 to 2,900 feet. He therefore took the lease from Singer, dated May 17, 1955, for a primary term of five years, and paid the broker a commission of $4,040 or $1 per acre. The consideration stated in the lease was that the lessee must commence a well on the premises by September 1, 1955, which well was to be drilled to a depth sufficient to effect a test of the Monroe Gas Rock or to a depth of 3,000 feet, whichever was the lesser, and lessee obligated himself to pay, upon failure to timely drill, the sum of $4,040, which payment would extend the time for commencement of drilling to December 31, 1955.
In order to comply with the drilling obligation stated in the lease, Poynter and Muth entered into a contract with Beasley of A & B Drilling Service whereby the *582 latter, for a consideration of $9,450 and a ¼ of 7/8 operating interest in certain leases in the block, agreed to drill a well on the Singer tract to a depth of 3,000 feet or less at the instruction of the operators, and to pay a ¼ proportion of all drilling costs incurred in carrying the well to a depth in excess of 3,000 feet.
Beasley, a man of extensive practical experience in the oil and gas field, had previously drilled numerous wells in the Epps Field, which gas field was approximately six miles distant from the site of the Muth-Singer well. He testified that his demand for a ¼ interest was predicated upon his discussions with several experienced oil and gas men as to the merits of the Texas Pacific log; that because of the proximity of the Epps Field, he, Beasley, regarded the entire locality as promising even in the absence of any special geology; that he did not take part in determining the particular location of the Muth-Singer well; and that the drilling of the well was done in a normal and workmanlike manner.
Edwin Howard, an employee of Poynter, who had supervised the drilling of oil and gas wells for some twenty-five years, testified he chose the Muth-Singer No. 1 location and that his decision was influenced by: his appreciation of the Texas Pacific log; because the location "lined-up" with the Epps Field; and because it was the only location on the premises which was easily accessible at that particular time of the year.
Mr. Frank S. Kelly, Jr., an independent oil and gas producer and the discoverer of the South Epps Field, testified that the Texas Pacific log indicated the locality was worthy of another test and that the Muth-Singer well was a good risk. He further stated that the well was a sufficient test of the productive sands of the Epps Field.
Appellants, although refusing to concede that the Muth-Singer operations were commenced and conducted in good faith, placed primary reliance on their contention that there was no reasonable expectation of obtaining production from the particular operations.
In support of that contention, appellants produced as a witness, John H. McCarter, Jr., a graduate geologist and Associate Professor of Geology at Northeast Louisiana State College, who has had considerable experience in superintending actual drilling operations. Mr. McCarter testified that the Texas Pacific well was located in the approximate center of the block of leases then held by the lessee, whereas, contrary to general practices in the oil and gas industry, the Muth-Singer location was at the extreme southern edge of the block of leases held by Poynter and Muth. McCarter stated that in his opinion there was no reasonable likelihood of obtaining production in paying quantities from the Monroe Gas Rock at the Muth-Singer location. He based his conclusion on an examination of the Texas Pacific electrical log, noting that said log was run through the Monroe Gas Rock on two occasions and that the second reading evidenced a change in resistivity, thereby indicating the formation contained salt water rather than oil or gas. McCarter considered the depth of the Muth-Singer well to be sufficient to test the producing sands of the Epps Field as well as the Monroe Gas Rock, but he stated the lenticular Hosston or Travis Peak formation, although penetrated by the well, was not completely tested thereby. McCarter also opined that there was no location on the leased premises where a well could have been as easily and inexpensively drilled as the site of the Muth-Singer well.
J. B. Corder, a former employee of Schlumberger Well Survey Corporation, testified that on the basis of his extensive experience in reading and interpreting electrical logs he was of the opinion that the Texas Pacific log contained nothing to encourage a reasonable expectancy of obtaining production in that locality.
E. J. Murdock, a consulting geologist called by defendants, testified that the 3,205 *583 foot depth of the Muth-Singer well was as deep or deeper than most of the wells drilled in the general area during the last ten years. Murdock opined that to an untrained examiner the Texas Pacific log might be indicative of a productive gas formation, whereas the trained observer would recognize the improbability of successful operations at the Muth-Singer site. Defendants' remaining witness, D. P. Lande, a geologist in the employ of Atlantic Refining Company, stated, as in fact did each of the expert witnesses who testified herein, that he would not have recommended the drilling of a well at the Muth-Singer location in light of the Texas Pacific electrical log.
From the testimony so presented, appellants have drawn the following conclusions which they contend establish there was no reasonable expectation of obtaining production in paying quantities from the Muth-Singer well: (1) the drilling site was selected on the basis of accessibility rather than geology, and had the operators sought to execute a mere "token" user of the servitude the site so selected would have been ideal inasmuch as there was less chance of encountering delay and expense at that particular location than anywhere else on the premises; (2) the well was located on the extreme southern edge rather than near the center of the premises and was, therefore, not selected primarily with the thought of securing production; (3) the site was only 1,100 feet from the dry hole drilled by Texas Pacific Coal & Oil Company in 1946, which dry hole condemned prospects of obtaining production in the immediate vicinity; (4) the operators' expectation of obtaining production was admittedly predicated upon their examination of the Texas Pacific electrical log, which expectation is shown by the evidence to have resulted from an inexpert, uncorroborated and erroneous interpretation of said log; (5) the operations were not conducted to a depth sufficient to adequately test the Hosston or Travis Peak formation; and, (6) each of the geologists who testified in this cause stated they would not have recommended the particular site.
Although it must be conceded that the Muth-Singer site was advantageous to the operators in that it was easily accessible, that factor does not of itself denominate as unreasonable the attempt to obtain production from that location. The fact that the well was located near the edge rather than near the center of the leased premises is of no particular consequence. Taylor v. Dunn, 1957, 233 La. 617, 97 So.2d 415. The remainder of the aforestated contentions of appellants are concerned with the geological reasonableness of locating the Muth-Singer well some 1,100 feet from the Texas Pacific Coal & Oil Company's dry hole. The following observations of the courts of this state are pertinent to our attempt to evaluate such testimony:
"We have read the expert testimony with deep interest. The most we can gather from the geologists is that their opinions are very fallible. That the most they can do is to point out what they consider the most likely place to drill, with no assurance as to results. That the determining opinion in drilling oil wells is that of the man sinking and paying for the well. That many fields have been developed in territory condemned by geologists." Lynn v. Harrington, 1939, 193 La. 877, 192 So. 517, 518.
"Geology is not an exact science, and it is a matter of common knowledge that geologists are subject to error with reference to their professional conclusions just as are doctors, lawyers and practitioners of other professions, no matter how qualified by training and experienced in practice they may be. Dry holes sometimes embarrassingly result from the soundest and most optimistic geological expectations. And, conversely, many oil producing areas today were developed in the very teeth of adverse *584 geological advice." Nunley v. Shell Oil Co., La.App. 2 Cir., 1954, 76 So.2d 111, 115.
"We agree with the finding of the district judge that the wells drilled by Zeigen were drilled to a sufficient depth and at a sufficient cost to show that they were drilled in good faith and constituted a fair and reasonable exercise of the mineral servitude. The record shows that Zeigen drilled 15 wells on the area which was covered by the mineral servitude. He was an experienced driller for oil and gas, having been engaged in the business for 16 years. He had so much faith in his efforts to produce oil or gas in this instance that he lost his fortune in the drilling of the wells under his lease from the Louisiana Central Oil and Gas Company. The depth to which Zeigen drilled complied with our latest definition of what constitutes a goodfaith test in a case like this. The definition appears in International Paper Co. v. Louisiana Central Lumber Co., 202 La. 621, 12 So.2d 659, 661, as follows:
"`The Louisiana Central Oil & Gas Company, through a lessee, commenced drilling a well for oil or gas on the smaller tract on November 1, 1929, and drilled beyond the depth at which any oil or gas had been produced in the nearest oil or gas field. The well was completed and abandoned as a dry hole on November 24, 1929; but the completion of the well was a fair test on the part of the Louisiana Central Oil & Gas Company.'" Lenard v. Shell Oil Company, 1947, 211 La. 265, 29 So.2d 844, 848.
The undisputed facts show that the Muth-Singer well was drilled at considerable expense to a depth of 3,204 feet. It penetrated the Wilcox and Monroe Gas Rock formations, which were the productive formations in the Epps and South Epps Fields. It also tested the formations producing in the Rayville Field and penetrated and tested the lenticular Hosston or Travis Peak formation to a depth of over 400 feet into said formation. The fact that geologists would not have recommended testing the formations at this particular site does not, in our opinion, establish that the operators, who as practical oil men were probably well aware of the fallibility of geological evidence, were unreasonable in expecting to secure production from the Muth-Singer well.
We do not believe it lies within the proper exercise of its functions for a court to substitute its judgment for that of an experienced oil man as to the location of an oil or gas well involving thousands of dollars of the latter's money. We are not prepared to hold that the decisions of practical oil and gas men, upon whom rests the burden of opening, discovering and developing new productive fields, must be evaluated in the light of, and conclusively bound by, geological interpretations subsequently advanced by expert geologists. Had the possibility of obtaining production from the Muth-Singer location been condemned by both geologists and practical gas men, as was the case in McMurrey v. Gray, 1949, 216 La. 904, 45 So.2d 73, we would have been inclined to agree with appellants that there was no reasonable possibility of obtaining production from the well. However, in the absence of such unanimity we are reluctant to attribute a preponderant effect to the opinions of one category of experts and thereby relegate to secondary importance the views entertained by practical oil and gas men who, by reason of their extensive experience, are entitled to equal if not greater recognition as experts in that particular field.
Accordingly, the judgment from which appealed is affirmed.
It is, therefore, ordered, adjudged and decreed that the mineral servitude result ing from the reservation of the oil, gas and other minerals in and under the following described land in Township 19 North, *585 Range 9 East, West Carroll Parish, Louisiana:
In Section 20SE¼, W½ of NE¼, and SE ¼ of NE ¼
In Section 27S½ of NW ¼ and W ½ of SW ¼
All of Section 28;
All of Section 29, EXCEPT the NW ¼ of
NW ¼ thereof;
In Section 30W ½
In Section 31NE ¼, N ½" of NW ¼, SE ¼ of NW ¼, W ½ of SE ¼, and S ½ of SW ¼
In Section 32NW ¼ and N ½ of NE ¼
All of Section 33;
All of Section 34, EXCEPT the E ½ of SE ¼ thereof;
In Section 35NW ¼
in the deed from the Singer Manufacturing Company to Kellogg Bros., Inc., dated April 28, 1941, filed in West Carroll Parish, Louisiana, under File 44,129 and recorded in Conveyance Book 13, page 336, of the records of that parish, is in full force and effect as a result of the prescription liberandi causa having been interrupted by drilling of wells in search of oil or gas thereon, the last such interruption resulting from the drilling of the Muth-Singer No. 1 well completed on September 1, 1955, and that the prescription which commenced accruing on September 1, 1955, thereafter was suspended as to all land included in the above description that was owned by plaintiff and intervenors upon the filing of this suit, i. e., April 3, 1958, and shall remain so suspended until this judgment becomes final.
It is further ordered that the oil, gas and mineral lease executed by Singer Manufacturing Company to and in favor of The Atlantic Refining Company on July 19, 1957, filed in West Carroll Parish, Louisiana, under File No. 117, 114 and recorded in Mineral Book 3, page 328, of the records of that parish, is declared to be in full force and effect as to all of the servitude, as described above, that is covered by said lease.
Costs of this appeal are to be taxed against plaintiffs and intervenors.