187 So.2d 455 (1966)
COLUMBIA GULF TRANSMISSION COMPANY, Plaintiff and Appellant,
v.
Percy J. FONTENOT, Defendant and Appellee.
No. 1674.
Court of Appeal of Louisiana, Third Circuit.
June 2, 1966.
Rehearings Denied June 29, 1966.
*456 Edwards & Edwards, by William C. Broadhurst, Crowley, for plaintiff-appellant.
Fusilier, Pucheu & Soileau, by J. William Pucheu, Joseph E. Coreil, Fruge & Foret, by Jack C. Fruge, Ville Platte, for defendant-appellee.
Before CULPEPPER, TATE and HOOD, JJ.
CULPEPPER, Judge.
This is an expropriation case in which plaintiff seeks a right of way, plus certain temporary working areas, for the construction of a gas transmission pipeline across defendant's property. The principal issues relate to the value of the servitude taken and the severance damages to the remainder of defendant's property. From a judgment awarding defendant $19,225, plus interest, etc., plaintiff appealed. Defendant answered the appeal, seeking an increase in the award.
The general facts show that plaintiff seeks a permanent servitude, 30 feet in width and containing 7.5 acres, plus 2 temporary work areas on either side of the right of way containing 11.3 acres. The total property affected is 18.8 acres. The pipeline to be constructed is 30 inches in diameter and will be used for the transmission of natural gas. It will run parallel to, and about 50 feet from, an existing pipeline constructed in 1953.
Defendant's property contains 3,000 acres in a rural area. About 1,000 acres is flat open land, 150 acres is partially cleared, 850 acres is hill land and 900 acres is in 4 lakes. The principal use of the property is for rice farming, the 1,000 acres of flat land being devoted to this purpose. Defendant also has about 350 head of cattle. In addition to his farming activities, defendant is utilizing the property as a recreational area. He has a duck hunting club of 40 members who pay $100 each per season; a boat rental service of 23 boats; a fish bait stand; 8 rental cabins; camp sites, 12 of which he presently leases at $50 a year; a fish hatchery; and a crayfish pond.
The right of way will cross 2 "prongs" of one of the lakes. Approximately 3 acres, *457 of the 18.8 acres affected, will be in this lake, and the remainder will cross the hill land. None of the rice land will be affected, nor will any buildings or permanent improvements.
With this general description of defendant's property and the servitude being taken in mind, let us first set forth the award by the trial judge which was itemized as follows:

1) Loss of timber (sawlogs, pulpwood and smaller trees on
 the permanent servitude and work areas) ................. $ 500.00
2) Restoration of lands (plowing, discing and leveling the affected
 area) ............................................ $ 375.00
3) Erosion prevention (terraces and seeding slopes left in the
 denuded area) ......................................... 2,000.00
4) Land taken (the value of the permanent servitude and temporary
 work areas expropriated) .......................... 1,850.00
5) Cost to move mud from lake (the cost of deepening by 5
 feet the 3 acres in the lake, to prevent excessive growth of
 marine vegetation) ...................................... 14,500.00
 _________
 Total ............... $19,225.00

We will first discuss the value of the permanent servitude and temporary work areas expropriated. Plaintiff introduced the testimony of 2 expert real estate agents and appraisers, Mr. Gilbert H. Vidrine and Mr. Marian Edwards, both of whom live, and have had considerable experience with land sales, in the area. Based on sales of comparable property in the area, and particularly the price paid by defendant himself within the last 5 years for the property at issue here, these 2 experts found the fee value of the 18.8 acres affected to be $100 per acre on the present market.
As opposed to the testimony of plaintiff's 2 expert land appraisers, the only expert testimony introduced by defendant was that of Mr. David E. Black. Actually, Mr. Black is an agricultural consultant, but, in this capacity, he advises clients on the cost of farm land. Mr. Black testified that because of the unique combination of rice farming, cattle grazing and recreational enterprises conducted by defendant, there were no sales of comparable property which could be used to establish the per acre value. Mr. Black used the "capitalization of income" method. He estimated the capital investment should earn 5% per year and capitalized this over a 20 year period; he contends the income from this property is $30,000 per year. Copies of defendant's income tax returns for the last 3 years show his earnings to be about $30,000 per year. But, there is some question as to whether all of this income was from the 3,000 acres in question, or whether part of it was from 3 other farms owned by defendant. Black concludes the property is worth "$1,200,000." or $400 per acre.
In his written opinion the trial judge points out that, even using Mr. Black's own capitalization of income method, his computations are in error. Even accepting $30,000 per year as the income from this property, and multiplying this by Mr. Black's capitalization figure of "20", would result in a total value of only $600,000. Dividing this by 3,000 would result in a per acre value of $200. This $200 per acre was the fee value found by the trial judge.
*458 There are forceful arguments against a finding of a fee value of $200 per acre. First of all, the 2 expert real estate agents and appraisers who testified for the plaintiff are entitled to more weight than the one expert introduced by defendant. Next the comparable sales method used by plaintiff's experts must be accepted in preference to the capitalization of income method used by Mr. Black. Our jurisprudence is well established that sales of comparable property in the area constitute the best evidence of value and that other methods, such as capitalization of income, are of lesser weight. State, Through Department of Highways v. Jones, La.App., 166 So.2d 538; State Through Department of Highways v. O'Neal, La.App., 150 So.2d 608.
Mr. Black's argument that we must use the average per acre value of the 3,000 acres as a whole, because the taking of this servitude will affect the entire property, is not supported by the law or the evidence. As a general rule, an expropriator must pay the actual market value of the portion expropriated, not the average per acre value of the whole parent tract. State Through Department of Highways v. LeDoux, 184 So.2d 604 (La.App. 3rd Cir. 1966). Furthermore, defendant does not contend that this servitude will affect the rice farming activities, which constitute the principal income producing feature of the property, or the cattle grazing, which is also a profitable use of the property. The only effect alleged as to the remainder of the property is that the denuding of the 18 acres will affect the squirrel hunting and the value of one acre of the land for camp sites and, as will be discussed in more detail hereinafter, the value of the lake for fishing. The evidence fails to support any of these contentions except as to the one acre suitable for camp sites. Thus the 18.8 acres affected are not such an essential part of the parent tract that their market value cannot be fixed separately.
The trial judge found the fee value of the 18.8 acres affected to be $200 per acre. Based on Central Louisiana Electric Company v. Fontenot, 159 So.2d 738 (La. App. 3rd Cir. 1964), he found the value of the servitude taken to be 50% of fee value, i. e., $100 per acre, and awarded $1,850 for the servitude taken. However, no distinction was made between the permanent servitude and the temporary working areas; nor was any express mention made of the fact that one acre of land suitable for four camp sites, which lease for $50 each per year, will no longer be suitable for this purpose. Considering all of these circumstances, we find the award of $1,850 for the servitude taken to be within the range of the trial court's discretion.
The award of $500 for the value of the timber taken and destroyed is reasonable and is supported by the evidence. There is very little dispute as to this item.
Regarding restoration of land, i. e., plowing, discing and leveling, for which $375 was allowed, and erosion prevention, i. e., terracing and grass seeding the 14 slopes which will be denuded of timber, for which the trial judge allowed $2,000, the only testimony in the record is that of Mr. Black. His testimony is to the effect that this expenditure is necessary to protect the right of way, and the adjacent land, from erosion. These are damages caused by the construction and for which the landowner is entitled to reimbursement.
The final item to be considered is the allowance by the trial judge of $14,500 to deepen by 5 feet the 3 acres in the lake. The landowner's contention is that cutting the trees in the right of way across the lake will allow sunlight to penetrate the water and cause an excessive growth of marine vegetation, principally "coon-tail grass", which will destroy the usefulness of this 3 acres for fishing, and thereby reduce the value of the property as a recreation area. Supporting this contention was *459 defendant's expert witness, Dr. Charles W. Caillouet, Jr., professor of Biology at the University of Southwest Louisiana in Lafayette. He described the lake as containing 225 acres, being about 6 feet deep, and heavily wooded (with tupelo gum and cypress), except for the existing right of way which was cleared when the 1953 pipeline was constructed. He testified that in the existing right of way the marine vegetation was very heavy; but that under the trees this constituted no problem; and that the reason was sunlight on the open water. He suggested 3 possible ways to prevent the heavy growth of vegetation in the new right of way, to wit: (1) removal of the vegetation by mechanical means each year; (2) poisoning the water 2 or 3 times each year; (3) drain the lake each year; and (4) deepen the 3 acres in the right of way by about 5 feet to prevent penetration of sunlight to the bottom.
As opposed to this testimony, plaintiff introduced that of Dr. Leslie L. Glasgow, who teaches Game Management courses at Louisiana State University in Baton Rouge and also acts as a consultant. Dr. Glasgow has approximately 18 years of experience, a great deal of which was with the particular problem of "weed control" in fishing waters. He testified that in this particular type of lake, where the timber is principally tupelo gum and cypress, the great accumulation of leaves, twigs and debris causes the water to be stained to the degree that penetation of sunlight, and growth of marine vegetation, even in open areas, is not a great problem. He examined this particular lake and found that there was about as much coon-tail grass under the trees as in the old right of way, depending principally on the depth of the water. He is of the opinion that the coon-tail grass is heaviest at about 3½ feet of depth, regardless of whether it's under the trees or in the open.
In view of this conflict in the testimony of the 2 experts who testified, the trial judge found in his original written opinion that the evidence was "too conjectural" to hold that the cutting of the trees in the lake would interfere with the fishing. We think the trial judge was clearly correct in this conclusion.
Nevertheless, in a "Per Curiam Clarifying Reasons Handed Down", the trial judge stated he was of the opinion the lake should be deepened as recommended by Dr. Caillouet and allowed $14,500 to deepen the lake and remove the spoil to the bank. We cannot agree that the evidence supports this conclusion. We think the trial judge was clearly correct in his first opinion that the evidence does not show there will be any appreciable increase in the growth of marine vegetation caused by the removal of trees from the right of way. An award of $14,500 to deepen the lake, an amount far in excess of the value of the 3 acres affected, is certainly not justified by any reasoning which occurs to us. As stated above, no other activity on the property will be affected, except possibly the fishing in this 3 acres. Even if the 3 acres were completely destroyed for this use, the evidence certainly does not show there would be $14,500 of consequential damages, i. e., diminution in market value, to the remaining property. Accordingly, we will not allow this item.
The next issue concerns 2 certain "multiple line agreements" granted by owners of portions of the subject property when the existing pipeline was constructed in 1953. These 1953 agreements provided for a right of way 66 feet in width, across the described tracts of land, for the construction of one pipeline. The language in the instruments regarding additional pipelines varies slightly, but the effect is the same, and we quote from one of them as follows:
"In the event Grantee desires to change or alter the route under, upon, over and through the property above described, from that shown on the annexed plat, or desires to construct any additional line or lines, even on the right of way conveyed herein, which right is specifically *460 granted herein, then Grantee will pay therefor to Grantor the sum of One and no/100 ($100) Dollars per lineal rod, together with any and all damages resulting to Grantor's property as a result of said change, alteration or additional construction."
Although the present suit is an expropriation proceeding, plaintiff contends that it is now the owner of all rights under these two 1953 agreements; that a portion of the property which it now seeks to expropriate is covered by and subject to said multiple line agreements; and, as to this covered portion, plaintiff is entitled to lay the new line for the payment of $1 per lineal rod, plus any damages sustained from construction.
The evidence fails to show that the new line will be located on any part of the 66-foot right of way granted in the 1953 agreement. Actually, it is not even shown that any part of the new 30-foot right of way herein expropriated will overlap the existing 1953 right of way. But, plaintiff contends that the 1953 agreements created one servitude burdening the entire tracts of land described with the right to construct additional lines at any place on the property for the payment of an additional $1 per rod. Plaintiff contends that the use of the first pipeline has prevented the accrual of 10 years liberative prescription, LSA-C.C. Article 789, for any additional pipelines which plaintiff desires to construct at any place on the property described.
We cannot agree with plaintiff's contentions. Applicable here are LSA-C.C. Articles 796 and 798 which provide:
"Art. 796. The mode of servitude is subject to prescription as well as the servitude itself, and in the same manner.
"By mode of servitude, in this case, is understood the manner of using the servitude as is prescribed in the title."
"Art. 798. If, on the contrary, the owner has enjoyed a right less extensive than is given him by his title, the servitude, whatever be its nature, is reduced to that which is preserved by possession during the time necessary to establish prescription."
Planiol's Traite Elementaire de Droit Civil, An English Translation By The Louisiana State Law Institute, Volume 1, Part 2, No. 2979, interprets Article 708 of the Code Napoleon, source of our present Civil Code Article 796, as follows:
"According to Art. 708: `the mode of the servitude may become prescribed as well as the servitude itself and in the same manner.' This means that partial non-use has the same extinctive effect as total non-use and that it diminishes the servitude to the extent that no use has been made of it. The servitude that has been but partially used, becomes reduced after thirty years. It cannot thenceforth be made use of to its full extent."
Ohio Oil Co. v. Ferguson, 213 La. 183, 34 So.2d 746 (1947) interprets LSA-C.C. Article 798 as follows:
"Counsel for Mrs. Fannie W. Bond rely upon article 798 of the Civil Code, which provides that, if the owner of a servitude has enjoyed a right less extensive than that which is given him by his title, the servitude, whatever be its nature, is reduced to that which is preserved by use or possession during the time necessary to establish prescription. That article, of course, is not to be construed so as to conflict with the rule, which is established by the jurisprudence, that where the owner of a mineral servitude on a single tract of land exercises his right by drilling on any part of the land he suspends prescription of the servitude as to all of the tract. But, when, as in this case, the owner of such a servitude disavows his intention or abandons his right to drill upon a specified part of the tract on which he owns the mineral servitude, article 798 is applicable."
Defendant argues the 1953 agreements created two different servitudes, *461 one for the first line and another for any additional lines, under which construction the servitude for additional lines is clearly prescribed by non-use. But, even if we assume, as plaintiff argues, that there was only one servitude providing for one or more pipelines, the failure to construct any additional lines during a period of 10 years, reduced the servitude to the one line which was actually constructed and used.
Also, use of the 1953 right of way for maintenance of the first line did not constitute use for any additional lines. LSA-C.C. Article 799 expressly provides that use of a mere "accessory right" shall not be considered use of the servitude.
Summarizing, for the purpose of clarity, we hold that plaintiff's failure to construct any additional lines during a ten year period constituted a use less extensive than that given plaintiff by its title, within the purview of LSA-C.C. Articles 796 and 798. Consequently, plaintiff has lost by prescription any rights it had under the 1953 agreements to construct additional lines.
The final issue concerns the expert witness fees allowed to defendant's witnesses, David E. Black and Dr. Charles W. Caillouet, Jr. By answer to the appeal, defendant contends Mr. Black's fee should be raised from $800 to $1625 and that Dr. Caillouet's fee should be raised from $1,000 to $1875. The award of expert witness fees is a matter which rests largely within the discretion of the trial judge. We find no abuse of that discretion here.
Summarizing, the judgment of the district court is amended to allow the following amounts:

1) Value of the permanent
 servitude and temporary
 working areas expropriated $1850.00
2) Loss of timber............ 500.00
3) Restoration of land........ 375.00
4) Erosion prevention........ 2000.00
 _________
 Total........ $4725.00

For the reasons assigned, the judgment appealed is amended by reducing the award from $19,225 to the sum of $4725. Except as herein amended, the judgment appealed is affirmed. The costs of this appeal are assessed against the appellant and the appellee in the proportion of one-half to each.
Amended and affirmed.

On Application for Rehearing.
En Banc. Rehearings denied.
FRUGE, J., recused.