CULPEPPER, Judge.
This is a suit for damages for trespass. Plaintiff is the owner of the tract of land on which the alleged trespass was committed. Defendant allegedly trespassed by removing an existing single line of poles and erecting in its place a line of H-frames, for the transmission of electrical power. The trial judge held there was a trespass and awarded $5,000 damages. Defendant appealed.
The substantial issue on appeal is whether defendant’s right to construct the H-frames was lost by prescription. The servitude title authorized “one line of poles, frames or towers”, but only the single line of poles was used during the first ten years. This involves a construction of LSA-C.C. Article 796, which provides that “The mode (manner of use) of servitude is subject to prescription as well as the servitude itself, and in the same manner.”
There is no dispute as to the facts. They were stipulated by agreement of the parties.
In 1949 plaintiff’s ancestor in title conveyed to defendant, by written instrument, the servitude which is described in pertinent part as follows:
“ * * * the right, privilege and servitude to enter upon and erect, construct, extend, maintain, inspect, operate, replace, remove, repair and patrol one line of poles, frames or towers, which may be erected simultaneously or at some future time, with lines of wires, cross-arms, guy wires, conduits, stubs, and other usual fixtures, appliances and appurtenances used or adapted for the transmission of electricity, electric energy and power for any and all purposes for which electricity, electric energy and power is now or may hereafter be used, and for telephone and telegraph use, together with all necessary foundations, anchors and braces properly to support the same upon, over and across a strip of land out of the following described tract:” (Then follows a description of the 704 acre tract of land.) (Emphasis added.)
The title also provides the accessory right to keep all trees and underbrush cut within fifty feet of either side of the servitude. It provides further that the landowner retains the right to use the lands covered by the servitude, so long as such use does not interfere with the servitude.
Pursuant to this title, the defendant constructed in 1949 an electric transmission line (hereinafter called the “single pole *347 line”), consisting of a single row of poles, each with an attached cross-arm, wires and the usual fixtures for the transmission of electricity. The single pole line was constructed on the center line of the servitude and the poles were located about 300 feet apart. After completion, these poles carried one 69,000 volt circuit of electricity.
In 1962 defendant removed the single pole line and constructed a row of H-frames. Each H-frame consists of two poles, twenty feet apart, with a cross-arm connecting the tops of the poles, to which are attached the usual fixtures and wires for the transmission of electricity. The H-frames are about 450 feet apart. One of the poles of each H-frame is on the center line of the servitude and the other is about twenty feet west thereof.
The new H-frame line now carries the original 69,000 volt circuit and an additional 138,000 volt circuit.
The parties have stipulated that the servitude title conferred upon the defendant the right to construct the H-frames. The sole issue is whether the right to erect the H-frame line has been lost by prescription.[1]
Applicable here are the following articles of our Civil Code:
“Art. 789. A right to servitude is extinguished by the non-usage of the same during ten years.”
“Art. 796. The mode of servitude is subject to prescription as well as the servitude itself, and in the same manner.
“By mode of servitude, in this case, is understood the manner of using the servitude as is prescribed in the title.”
An example of what is meant by the “manner of using the servitude” is found in LSA-C.C. Article 780 which reads in pertinent part as follows:
“Art. 780. If the title by which a passage is granted does not designate its breadth, nor the manner in which it is to be used, whether on foot, or horseback, or with carriages, the use which the person to whom the servitude is granted previously made of it will serve to interpret the title.”
In the present case the servitude is for the transmission of electricity across the property by different modes, i. e., by using “poles, frames or towers”. These three modes of use can be compared with the use of a right of passage on foot, horseback or with carriages, mentioned in LSA-C.C. Article 780.
Having concluded that the poles, frames or structures are different modes of use of the servitude granted in the title, it is obvious that under a literal construction of LSA-C.C. Article 796, quoted above, the failure to use the H-frames for a period of ten years extinguished this mode of use by prescription.
Defendant argues that our courts cannot construe LSA-C.C. Article 796 literally; that to do so will lead to absurd results. A substantial portion of defendant’s brief is addressed to the proposition that since both a mineral servitude and an electric line servitude are discontinuous, in that they need the act of man to be exercised,[2] any decision rendered here will also apply to mineral servitudes. Defendant contends that a literal interpretation of LSA-C.C. Article 796 will do violence to many established principles in the field of mineral law.
It is true that our jurisprudence generally has classified the mineral servitude as *348 discontinuous, but these cases also recognize that our mineral law cannot be reconciled with all of the statutory law of servi-tudes. Mineral law jurisprudence has evolved many principles which are at variance with some of our Civil Code Articles relating to servitudes. For instance, in Ohio Oil Company v. Ferguson, 213 La. 183, 34 So.2d 746 (1946), the original opinion of the court, at page 754, states that Civil Code Article 798, pertaining to prescription of the extent of a servitude, cannot be construed so as to conflict with established jurisprudence in the field of mineral law. We quoted portions of that opinion in our decision in Columbia Gulf Transmission Company v. Fontenot, La.App., 187 So.2d 455, to make it clear that mineral law is not affected by our decision there. (More about Columbia Gulf later.) Furthermore, in Ohio Oil the majority opinion on rehearing, at pages 767-768 of 34 So.2d states:
“We concede that dominant and servient estates, which are necessary for the establishment of predial servitudes, are not necessary under our jurisprudence for the establishment of mineral servitudes. However, this court has consistently applied to mineral servitudes Article 789, * * * ”
We wish to set at rest all arguments that our mineral law will be affected. We now expressly hold that no portion of this opinion and no construction by this court of LSA-C.C. Article 796 in any previous case will have any effect whatever on the established principles of mineral law in this state.
The defendant next questions our reasoning in Columbia Gulf Transmission Company v. Fontenot, La.App., 187 So.2d 455 (3rd Cir. 1966), followed in Veillon v. Columbia Gulf Transmission Company, La.App., 192 So.2d 646 (3rd Cir. 1966).[3] The district judge relied on these cases in the present matter. Columbia Gulf involved a so-called “multiple-line agreement”, authorizing the construction of one pipeline, but with the provision that the grantee could construct additional lines upon the payment of $1 per rod. The first line was laid soon after the servitude was granted in 1953. No additional lines were constructed until after ten years elapsed. One of the principal issues argued was whether the multiple line agreement provided for only one servitude or for separate servitudes for the additional pipelines. Of course, if it provided separate servitudes for each pipeline, the second servitude was prescribed by nonuse. However, the utility company argued persuasively that the multiple line agreement provided for only one servitude and therefore the use of the first pipeline preserved the right to construct and use the additional lines. In answer to this argument we held that even if the multiple line agreement created only one servitude, each additional line was a different mode of use which prescribed under the provisions of LSA-C.C. Article 796.[4]
Our Supreme Court denied writs in Columbia Gulf Transmission Company v. Fontenot, 249 La. 717, 190 So.2d 234 (1966), stating that “According to the facts of this case, as found to be by the Court of Appeal, the result reached by the Court of Appeal is correct.” However, three justices were of the opinion that the multiple line agreement created more than one servitude. One justice thought the writ should be granted in order to clarify the jurisprudence in this important area of the law.
*349 Unlike Columbia Gulf Transmission Company v. Fontenot, supra, the written instrument in the present case cannot be construed as creating more than one servitude. Hence, we are faced with the question of whether one of the modes of use provided by the title is prescribed under LSA-C.C. Article 796. In view of the questions which have been raised as to our construction of this article in the Columbia Gulf case, we will review the matter.
We will first consider the history of LSA-C.C. Article 796, both in this state and in other Civil Law systems. In classical Roman law, a praedial servitude was lost by two years nonuse. (Paul. Sent. 1, 17, 1). Justinian extended the period to ten years where both parties lived in the same province and twenty years where they did not. (C. 3, 34, 13). Partial nonuse of the servitude did not affect it, apparently. The servitude of right of way was designated as a “positive” one (involving actual interference with the servient land) and as “rustic” in contradistinction to “urban”. See: Buckland, Manual of Roman Law. (2d ed. 1957) pp. 158-161.
Domat in his Les Lois civiles dans leur ordre natural, (Book I, Title XII, Section VI, No. 5) wrote concerning the extinction of praedial servitudes that “les servi-tudes se perdent par la prescription ou elles sont reduites á ce qui en est conservé par la possession pendant le temps suffisant pour prescrire.” Domat spoke of prescriptive periods of ten and twenty years. In Book I, Title XII, Section VI, No. 6, Domat wrote in part as follows: “Les servitudes qui consistent en quelque action de la part de ceux á qui elles sont dues, se prescrivent par la cessation de l’usage de la servitude. Comme un passage, et une prise d’eau, qui se prescrivent par la cessation de passer, et de prendre l’eau.”
Planiol and Ripert (Traité élémentaire de droit civil. No. 2979, n. 1) considers that Domat was here innovating and that Domat’s “new idea” was adopted into the French Code as Article 708. This article provides that “le mode de la servitude peut se prescrire comme la servitude méme, et de la méme maniere.” It is to be noted however that the French Civil Code adopts a period far longer than Roman law or than that referred to by Domat, namely, by Article 706 it is provided that “la servitude est eteinte par le nonusage pendant trente ans.” (30 years)
France has not been alone in adopting a provision concerning the prescription of the mode of the servitude.
Louisiana by its Civil Code of 1825 in Article 796 provided that “The mode of servitude is subject to prescription as well as the servitude itself, and in the same manner.” But Louisiana went on to give an example: “By mode of servitude, in this case, is understood the manner of using the servitude as is prescribed in the title.” (italics added) Louisiana also departed from the French doctrine in providing that the prescriptive period should be ten years only rather than thirty. (italics added) This reduction of the time period might be said to support the idea that unused servitudes were not to be favored.
Belgium in her Civil Code has an article identical with the French one repeating the thirty year provision.
Mexico (Codigo Civil. Art. 1, 134) provides that “El modo de usar la servidumbre puede prescribirse en el tiempo y de la manera que la servidumbre misma.” As to the time of prescription the Code provides in Art. 1, 128.11 that “cuando (la servi-dumbre) fuere discontinua o no aparente, por el no use de cinco anos” (italics added). Here we see a further reduction in the time allowed.
On the other hand, the Italian Civil Code takes a contrary position on the matter of the effect of nonuse as to the mode of servitude. Art. 1075 provides: “Esercizio limí-talo della servitutu. La servitu esercitata in modo da trame un’utilita minore di quella indicata dal titolo so conserva per itero.”
*350 It is interesting to note that the Civil Code of the Empire of Ethiopia (the most recent of the code revisions), which was in large part the work of Professor René David of the Faculty of Law of the University of Paris and hence well aware of the criticism by French courts and writers of French Civil Code Article 708, contains in Art. 1382 a provision identical to Art. 708, but reduces the prescriptive period to ten years rather than thirty as in France. The article provides: “Extinction partidle. Le mode d’exercise de la servitude peut se prescrire comme l’existence méme de la servitude et de la méme maniere.” Art. 1381.(3) contains the limitation term of ten years.
From these code materials we can draw the following conclusions: (1) The codes of France, Louisiana, Belgium, Mexico and Ethiopia provide for partial extinction regarding the mode of use of a servitude; and of the modern codes, only Italy does not. (2) The time for prescription has been shrinking in the newer codes, which might be said to indicate a desire to limit the servitude burden and to require people to make use of servitudes promptly.
Now let us see how the courts and the commentators have treated the Code Articles. Despite the plain wording of Article 708, the French Court of Cassation as early as 1860 drew a distinction as follows in the application of the article: where the owner of the dominant land reduced the exercise of his rights in the servient tenement voluntarily, using it according to his needs, the servitude was not reduced; but where the restriction in the mode of use of the servitude was due to a physical obstacle,- the servitude was reduced, e. g. Cass.Civ. 29 August 1882. S. 1884.1.-391 (Hauguel c. Portal) The servitude in question comprised, according to the act which constituted it, the right to enter and to leave at any hour of the day or night, whether on foot or on horse. The proprietor of the servient land alleged that for more than thirty years the right to enter and to leave had never been exercised at night or by horse or wagon; and that therefore the servitude ought to be declared partially extinguished by nonuse; and limited to a simple right of passage on foot and by day. The court held that if the servitude may be exercised in various ways, it does not follow that one ought to divide it into so many distinct rights. It was held that in that case there are several modes of exercising the servitude; that the servitude of passage, such as it was constituted in 1849, is indivisible; that he for whose profit it is established has the option among the means of exercising it and that it is sufficient that he used it in one of these manners to preserve the servitude entire.
The position taken by the French Court of Cassation has been approved by the commentators. Planiol et Ripert, Traité élémentaire de droit civil, T.I. No. 2979. Ch. Beudant, Cours de droit civil franqais, T. IV. p. 667. Aubry et Rau, Droit civil franqais, T. III. No. 255. Colin, Capitant et de la Morandiére, Cours élémentaire de droit civil franqais, (ed. 11 1947) T.I. No. 1294. Carbonnier, Droit civil. (1956) No. 54, where he writes that one result of leaving the servitude intact in all its amplitude where the restraint was voluntary is to encourage moderation in the exercise of rights.
The French position would also seem to be favored in Belgium among the commentators, discussing the corresponding article in the French code. See: H. de Page, Traite elementaire de droit civil Beige, T. VI. (1953). No. 670. De Page gives as his reasoning: “All the world is in agreement that when the owner of the dominant lands is prevented by the act of a third party or by a cas fortuit from drawing from the servient land all the use of which it is susceptible, the partial nonuse of the servitude results in the extinction of the nonused part. But it is otherwise where the partial nonuse is voluntarily done, without duress or impediment. There it is said that the right of servitude is preserved entire. Why? Because one ought to leave to the holder of the servitude a certain liberty of action; he *351 ought to be permitted to realize the services due to his dominant land in accord with his needs and with his personal convenience; to decide otherwise would be to oblige the owner of the dominant lands to use without ceasing all the rights granted; a solution little practical or opportune.”
Summarizing, it appears that a decision that the servitude in the present case was not partially extinguished could be supported from the French jurisprudence and commentators, from early Roman law and from the modern Italian code.
On the other hand, the following arguments could be made for the partial extinction of the servitude by nonuse.
1. The Louisiana Civil Code does not make the distinction argued for and there is no requirement for Louisiana to follow the French interpretation unless we find a literal interpretation of the code article leads to an absurd result, not intended by the legislature. In this connection, it is to be noted that the French have not modified the code article by legislation nor have we found any material in point in the project for reform of the Civil Code of France. A foremost French comparatist, Professor René David, has placed the same unmodified article in the new Civil Code of Ethiopia and has not amended it to accept the Cour de Cassation’s view and limited interpretation, a course which was presumably open to him.
2. Louisiana has already departed from the French position by using a prescriptive period of ten years, rather than the thirty year period used in France, and has thus seemed to express its wish to limit the time in which the dominant landowner can delay his activity or choice, with regard to the benefits granted. It is to be noted that the period in Mexican law is even shorter. (5 years)
3. While it may be true to say that where several modes are permitted to the dominant landowner by which he may exercise his rights, he should not be rushed into making use of the fullness of his rights, yet there is also merit in saying that ten years is a sufficiently long time for him to decide and that the servient landowner is entitled to know the extent of his burden within ten years. To hold otherwise would seem to favor the restoration of “semi-feudal” rights which the French and Louisiana codes were opposed to.
4.In these days when we favor renegotiated agreements, it would not seem unreasonable to expect the utility company and the landowner to renegotiate for the “double line of poles.”
In the concluding portion of its brief, defendant gives several illustrations of what it contends would be absurd results from a literal interpretation of LSA-C.C. Article 798. Our first answer to this contention is that we are not here concerned with Article 798, which has to do with the prescription of the extent of a servitude where less than its area is possessed. This case involves LSA-C.C. Article 796 pertaining to the extinction by prescription of a mode of use of a servitude.
However, one or two of the “absurd results”, given by defendant for illustrative purposes, could perhaps involve LSA-C.C. Article 796. The first example is that an electric power company operating a single line which is destroyed by a hurricane would lose the right to replace and repair the destroyed facilities. This argument has no merit. In such a situation the use of the power line constituted a use of that mode of the servitude to prevent the running of prescription and the line could be replaced.
Another example given by defendant is that an electric power company would be barred from replacing obsolete equipment with modern but different equipment on an existing power line after ten years. This argument has no merit. There could be no objection to replacing old equipment with new, so long as the mode of use with the new equipment was authorized in the original title and not prescribed.
*352 Of course, it is true that a literal construction of LSA-C.C. Article 796 may on occasion work to the disadvantage of the owner of the servitude, but this is certainly not the same thing as saying that it is an absurd result. In every policy question of this type, there are equitable considerations on both sides. Our legislature has considered these policy arguments and adopted LSA-C.C. Article 796 as written. The courts must follow a law adopted by our legislature, where the language is clear and unambiguous, as in the present case, unless a literal construction of the statute will lead to absurd or unreasonable results. We fail to see such a result in this case. Here the defendant’s title authorized one line of poles or frames. Only the poles were used during the first ten years. Then defendant decided to erect H-frames, a mode of use which is obviously more burdensome to the landowner. This is the very type of situation contemplated by Article 796. The law seeks to suppress burdensome servitudes which are not used for a long period of time. For us, the most important consideration is to determine the intent of the legislature. LSA-C.C. Article 13. Here, the intent of the legislature appears to be clear.
The district judge in the present case has pointed out an inequitable result which could follow from a decision in defendant’s favor. If the H-frame, consisting of two poles, is to be permitted as being nothing more than a modification of a single pole line, then, in theory, there is no reason why a frame consisting of four or six or eight or ten poles abreast of each other could not be constructed. The right to construct such burdensome structures should not be preserved forever by a single line of poles.
The parties stipulated that if the court finds there was a trespass, the damage is $5,000. Hence, there is no dispute as to this amount which was awarded by the district judge.
For the reasons assigned, the judgment appealed is affirmed. All costs of this appeal are assessed against the defendant appellant.
Affirmed.

. This is made clear in the stipulation between the parties which reads in pertinent part as follows: “The Servitude Grant conferred upon Gulf States the right to erect, construct, maintain and operate the ‘H-Frame’ line, and this proceeding solely involved the question of whether such right has been lost by the liberative prescription of ten years for failure to have so erected, constructed, maintained and operated said ‘EC-Frame’ Line within 10 years from the date of the Servitude Grant.”

. LSA-O.C. Article 727.

. Our decision in Columbia Gulf has been criticized by case notes in 21 Law Review, 260, and 41 Tulane Law Review 947, insofar as the decision is based on LSA-C.C. Articles 796 and 798.

. In Columbia Gulf there was also a question as to the extent, i.e., the width of the servitude which was used, an issue which addressed itself to LSA-C.C. Article 798. In the present case we are not concerned with the loss by prescription of any portion of the area of the servitude. Here, our only concern is with the loss by prescription of one of the different modes of use set forth in the title, LSA-C.C. Art. 796.