MILLER, Judge
(dissenting).
As I view this case, defendant has not exercised its servitude on the land in question. The trial court judgment should be affirmed.
There is no question but that part of the land granted in the servitude has been used in the manner for which the servitude was *303 granted. There is no claim by plaintiff to this portion of the grant. Therefore I am not disposed to consider LSA-C.C. Arts. 790 and 791 which presuppose a claim to land which was at one time put to use under a grant of servitude. Rather, plaintiff has made claim to land lying within the limits of the grant but which has never been physically taken for the purpose for which the servitude was granted. Therefore the question before us is twofold: 1) Does the Civil Code provide for the Iterative prescription of part of the area of a grant of servitude on the basis of partial non-use. 2) Under the facts of this case, has there been a non-use of the area in question so that landowner may claim it by way of prescription.
My answer is yes to both questions.
It was well said in Hanks v. Gulf States Utilities Co., 253 La. 946, 221 So.2d 249, 251 (1969) that:
“Most important to a consideration of the narrow issue before us is an understanding of what constitutes a servitude.”
The court then offered a definition, appropriately emphasizing from 1 Domat, The Civil Law in Its Natural Order § 1018 (Strahan tr. 1861):
“In the civil law, serviture is ‘ * * * a right which subjects a land or tenement to some service, for the use of another land or tenement, which belongs to another master * * ”
Therefore it should be kept in mind during the following discussion that all conceptualizations regarding servitudes should revolve around the basic consideration that the dominant estate is attempting to gain some benefit via the discharge upon the servient estate of some right created by contract.
Initially it must be noted that the owner of an estate may establish upon his estate, by title, any type servitude that he deems proper, and when so established, the use and extent of the servitude are regulated by the contract. LSA-C.C. 790. See also 743, 766, 770, 774, 778, 779, 780. What courts must do then, in the area of conventional servitudes, is to attempt, through contractual interpretation, to arrive at the intent of the parties. It must be kept in mind during this process that “servitudes which tend to affect the free use of property, in case of doubt as to their extent or the manner of using them, are always interpreted in favor of the owner of the property to be affected.” LSA-C.C. Art. 753 (Emphasis added.), McGuffy v. Weil, 240 La. 758, 125 So.2d 154, 158 (1960).
In its contractual interpretation, a court will be faced with the determination of three different things: the purpose of the servitude (right granted), the permissible methods of implementation (modes of use), and accessories (things necessary to permit a use of the purpose). These three things are interrelated and build one on another cumulatively to permit the realization of the benefit to the dominant estate. Of the three, the purpose of the servitude is the principal cause of the contract— “. that consideration without which the contract would not have been made.” LSA-C.C. 1825.
In the area of prescription for non-use, the crucial determination in every case is the purpose for which the servitude is granted because “to use a servitude, so as to interrupt prescription, is to use it in the manner contemplated by the grant or reservation.” Louisiana Petroleum Co. v. Broussard, 172 La. 613, 135 So. 1, 2-3 (1931). Therefore, once we have determined the purpose of the servitude by examining “. . . the title to ascertain what benefit, advantage or use it gave to the beneficiary” (Hanks, supra, 221 So.2d at 251) “. . . reference must . be made to the object (thus ascertained) to determine whether there has been such use as to interrupt prescription.” La. Petroleum, supra, 135 So. at 2-3). The concern here is that the acts done on the servient estate comport with the nature of the purpose of the servitude so that per *304 formance of these acts may be said to be a “use” of the servitude, i. e. if the purpose is passage, cutting grass along the proposed route is not a “use” of the servitude whereas crossing the route in a car would be. Only where the modes of use are specified in the title does the phrase “. . . manner contemplated by the grant .” have reference to specific acts rather than the nature relationship of “use” and purpose. There need be no specification or limitation of modes of use in the title in order to make a conventional servitude valid. See Art. 780.
After ascertaining that a use has been made of the servitude the next question before us is whether this use has prevented prescription of the entire area of the grant or only of part of it. Relevant here is a discussion of the concept of mode of use and accessory.
MODE OF USE
Mode of use, as has been seen, is an implementation of the servitude (purpose). Depending on the purpose and its nature, the use of it may be only an implementation thereof or may be so bound up with the purpose as to be one and the same thing. For example, if the servitude is transmission of electricity then there has been no “use” of the servitude until electric current is actually transmitted across the servient estate. All other acts are merely preparatory to the “use” of the servitude. Here, purpose and use are one and the same. If the purpose is the construction of a specific canal, then the servitude is not used until construction has begun. Here again “use” and purpose are one and the same, however, as will be seen, the difference in the nature of the two purposes above — transmission versus construction— will cause different results in re partial prescription of an area because of non-use.
If the servitude were one of passage, then walking on foot would be a use of the servitude, but it would not, in and of itself, exclusively embody the purpose so that a use could not be made of the servitude by other modes such as riding horseback or in a car. The servitude of aqueducts has for its purpose the carrying of water (transmission) over the servient estate and is not “used” by the construction of the physical plant but by the opening of the flood gate and the subsequent flowing of water. Acadia-Vermilion Rice Irrigating Co. v. Broussard, La.App., 175 So.2d 856 (La. App. 3 Cir. 1965). This situation is identical to that of the transmission of electricity. The servitude of drain may be a natural one (Art. 660) or it may be created by contract (Art. 709). In both instances the purpose is the carrying of water from the dominant to the servient estate. In the former case the water carried is naturally created, i. e. rain etc., and if this is the situation in the latter case, the use of the servitude, being beyond the control of the beneficiary, prescription would not run against him for non-use. The construction of the physical plants permitting such natural use in this latter case (grading of the land, networks of canals, etc.) would not be a use of the servitude. If the drainage servitude created by contract was for the discharge of artificial waters such as from a swimming pool, the use (discharge of water) would be within the province of the beneficiary and subject to non-use prescription.
ACCESSORIES
An accessory right is one “. . . necessary to [the] use [of] such servitude .” Art. 771 (Emphasis added.) See also Art. 779. It follows that the constructions which must precede a use of the purpose so as to enable the use to be perpetuated are accessories. The example given in Hanks, supra, was that the purpose was transmission, the use was the sending of electric impulses across the servient estate, and the accessory was the construction of poles and lines to permit the use. The court thus finding the poles to be accessories, found new types of constructions insusceptible of non-use prescription as a *305 mode of use. Relevant here is the argument made in 30 La.L.R. 354, 358 that to be an accessory right, Art. 771 requires that something be necessary and that since the electricity had been transmitted on single poles, H frames were not necessary and therefore the construction of poles were not accessory in nature but were modes of use. Pretermitting the application of my analysis of modes of use (which I believe destroys the writer’s argument), I take note of the fact that this author cites no authority for the proposition that to be an accessory a thing must be unique and incapable of replacement or alteration. Merely because different types of construction could be used does not deprive the right of construction of its accessory nature.
Now, keeping in mind the interaction of purpose, use, and accessory, I move to an examination of a theory of partial non-use prescription of the area of a grant of servitude.
It must be kept in mind that the situation before us as well as those before the courts in Hanks, supra, and Columbia Gulf Transmission Co. v. Fontenot, 187 So.2d 455 (La.App. 3 Cir. 1966) is not one of a true servitude as defined in Art. 646. There is no dominant estate here. There is instead the Atchafalaya & Bayou Bouef Levee Board which is similar in its conceptual existence to that of the public utilities in the Hanks and Columbia cases. Although this fact may have some bearing on determining the intention of the parties with reference to the purpose of the servitude, I find myself in agreement with the statement in 30 La.L.R. 354 at 357 that “. . .an analogous application of these statutes (dealing with conventional servi-tudes) is all that is required in this situation.” (Parenthetical addition by writer.)
We must first look at the dominant estate to see what interest it seeks to promote. It is the nature of this interest (purpose) that determines whether the entire area of the grant is embodied with an interruption of prescription for non-use when the purpose is implemented or used. It is not the nature of the use of the servitude or how much land or area the use consumes that determines the area extent of the interruption of prescription. Rather it is the nature of the purpose that delimits the interruption’s application.
If the purpose is a broad one not limited in its discharge (use) to any specific type of discharge then implementation by an acceptable use will work an interruption of prescription in favor of the purpose over the entire area irrespective of the fact that the use itself is dependent upon an area oriented accessory and is also completely intertwined with the purpose. The exact example of this is the Hanks case. The benefit sought by the beneficiary in that case was the transmission of its# commodity, electricity, across the servient estate. The implementation of the purpose was the sending of electric impulses across the ser-vient estate. Due to the present sophistication of the industry, this implementation depended upon the construction of certain types of accessories (lines and supporting structures) which physically took part of the land encompassed in the grant. However, transmission itself is not conceptually limited to a physically oriented implementation and once transmission has been accomplished, this purpose has been activated as to the entire area. If electric transmission, as a purpose-concept, later progresses and requires implementation via H-frames, any or all of the area of the original grant may be used. The purpose was not, by its nature, confined in its execution to a certain square footage and its implementation by one method could not thereby work such a limitation. The same result is true in the situation where we have a servitude for the purpose of drainage. From the eyes of the dominant estate, the benefit is the ridding itself of excess water. This benefit is not conceptually limited to an area oriented implementation and therefore though the sending of water through ditches is an implementation and serves to in *306 terrupt prescription for non-use as to the purpose of the servitude, the purpose’s prescription is not limited in its area interruption to the physical confines of the canals. Drainage may later be implemented by a grading of the entire area subject to the grant. Passage as a purpose is another example of this type of servitude. Conceptually passage may be accomplished by many uses or implementations. Walking will prevent prescription of this purpose but the interruption of prescription for use of this purpose will extend beyond the beaten trail worn by feet. Later use by trucks or horses on the same trail or different portions of the area of the grant will be permissible.[1] This conceptual approach is probably at least the subconscious basis for the rule that where the owner of a mineral servitude (defined as to purpose in La. Petroleum Co. v. Broussard, 172 La. 613, 135 So. 1, 2-3 (1931) as “. . . for the purpose of exploring for oil, gas, and other minerals . . .” [Emphasis added.]) exercises (uses) his right by drilling on any part of the land he suspends prescription of the servitude on all of the tract. Ohio Oil Co. v. Ferguson, 213 La. 183, 34 So.2d 746 (1947).
On the other hand, if the purpose is a narrow one with its total realization conceptually limited to one specific land oriented implementation, the purpose, when so implemented, is circumscribed in its prescription interruption to the area actually physically taken for its implementation. If the implementation is allowed to remain in a particular state of completion for 10 years the area so used is the only land retained under the grant and the rest of the grant will return via liberative prescription to the owner of the servient estate. See Arts. 798 and 3529. Examples of this are the servitudes for the purpose of building a named road as opposed to the generalized servitude of passage and the servitude for the purpose of building a specific named canal as opposed to the general servitude of drainage. In these cases, the purpose is the building or construction of a certain work, for example, a canal. This purpose is conceptually limited to a limited physical object, whatever be its size. The servitude is “used” when construction is started. The grant is given within boundaries without either party knowing how large the construction will be. As long as conscientious construction is maintained, it may go on past 10 years and encompass the whole grant. Or, if once completed, enlargement may be initiated within 10 years thereafter if done so in good faith with intent to finish in a reasonable time, and any number of such subsequent good faith enlargements may be initiated if done so before the lapse of 10 years between them. If, however, the pause between enlargements is more than 10 years, the canal may go no wider and the excess land reverts to the servient estate. Also, as in the case of unconscientious drilling in mineral servitudes (McMurray v. Gray, 216 La. 904, 45 So.2d 73 [1950]), initiation of a canal without intention to complete will not interrupt prescription as to the purpose of the servitude (nor, of course, as to any area) and neither will prescription remain interrupted beyond a point where construction once begun in good faith has dwindled away into insincerity. The latter holds true as to increases in area prescription for enlargement projects.
Having set forth the theoretical basis for a partial prescription of the area of a grant based on non-use, I now submit codal and jurisprudential support.
There have been several perceptive articles written regarding the basis of partial *307 prescription for non-use in Louisiana: Meyer, Servitude-Prescription for Partial Non-Use — Louisiana Civil Code Articles 796 and 798, 44 Tul.L.Rev. 625 (1970); Lobrano, Servitudes — Reduction of Use-Application of Articles 796 and 798, 41 Tul.L.Rev. 947 (1967); Weems, Mineral Law-Servitudes — Prescription — Reduction of Partially Used Multiple Line Gas Pipeline Servitudes, 27 La.L.Rev. 634 (1967).
The Civil Code Articles relevant to this discussion are as follows:
“Art. 796. The mode of servitude is subject to prescription as well as the servitude itself, and in the same manner.
By mode of servitude, in this case, is understood the manner of using the servitude as is prescribed in the title.”
“Art. 797. If he to whom a servitude is due enjoys a right more extensive than that which is given him by the act establishing the servitude, he will be considered as having preserved his right of servitude; because the less is included in the greater.
But he can not thus prescribe for the surplus, and can be compelled to confine himself to the exercise of the servitude granted by his title, unless it be a continuous apparent servitude, which he has acquired by prescription.”
“Art. 798. If, on the contrary, the owner has enjoyed a right less extensive than is given him by his title, the servitude, whatever be its nature, is reduced to that which is preserved by possession during the time necessary to establish prescription.”
It is apparent that partial prescription for non-use as a concept, apart from its application to area or modes, originated. with a translation by Domat of the Digest of Justinian. The exact wording of LSA-C.C. Arts. 797 and 798, with the one change being the use of the first person pronoun, is found in Toullier who cites Domat as his source. See 27 La.L.Rev. 634, at 637.
Articles 797 and 798 first appeared in the Civil Code of 1825 without a counterpart in the Code Napoleon. The redactors, in the project of the 1825 code, cite the above mentioned references to Domat and Toullier as the source of the articles. There are no explanatory notes regarding these articles so we must return to basics regarding servitudes in order to ascertain the exact application of these articles.
With the exceptions of servitudes of prohibition, light and view, servitudes, irrespective of their nature as continuous, discontinuous etc., normally involved at least a transient use of an area by the beneficiary of land on the servient estate. Art. 655. There is significant preoccupation in the code with both the concepts of modes of use and of area of use. The last paragraphs of Arts. 709 and 722 respectively state:
“The use and extent of servitudes thus established are regulated by the title by which they are granted, and if there be no titles, by the following rules.”
“When it is the result of a contract, its extent and the mode of using it is regulated by the contract.”
In Article 776 we find:
“. . . thus, for instance, in case of a right of passage, all the owners are bound to exercise that right through the same place.” (Emphasis added.)
In Article 777, we find:
“. . . thus he can not change the condition of the premises, nor transfer the exercise of the servitude to a place different from that on which it was assigned in the first instance . . . ” (Emphasis added.)
The concern over modes of use has extended into the articles dealing with extin-guishment of rights by non-use and is manifested in Art. 796. This article sets *308 forth not only the concept of prescription of modes of use but defines as well what is meant by modes of use in re this prescription. Only modes set forth in the title or which may be ascertained as contemplated by the contract via Art. 780 are subject to prescription. The apparent reason for this is that once modes of use have entered the contractual field by way of express mention or implied inclusion, they are deemed to form part of the cause or consideration of the contract, much as does the purposes of the servitude. It would appear that in such cases, the owner of the servient estate has bargained principally for the money consideration but has also bargained for some sort of restriction of the implementation of the servitude via an enumeration of its modes of use. Where no such intent to contract can be found, it is presumed that mode of implementation was of no concern to the servient estate and modes would thereby be subject only to the restriction of Art. 778, and not be independently subject to prescription for non-use — with one exception. That is when such a mode (not part of the consideration of the contract) has been materially prevented in its discharge, by the holder of the servient estate, he has manifested his intent to circumscribe such actions on his estate and when the holder of the servitude fails to object and thereby acquiesces by implication, he is barred under Art. 3529.
The modes of use for purposes of prescription under 796 assume the nature of the servitude to which they are attached (Planiol vol. 1 Part 2, no. 2948) and therefore, modes of use prescriptible under 796 would, by terms even of the article itself, be prescribed in the manner prescribed in 790 and 791 as well as 789. Those modes not prescriptible under 796 would not prescribe for pure non-use but require, as shown before, an affirmative impediment for 10 years.
This discussion of modes is offered to illuminate what I believe is a dichotomy in application between 796 and Articles 797 and 798. Under 789, 790 and 791, the entire right of servitude may be prescribed. As pointed out before, there is significant codal preoccupation with the determination of both the area and the mode of servi-tudes. Art. 796 coupled with 790 and 791 provides for the prescription of modes of use. It is my contention that 797 and 798 provide for the prescription of part of the area of a servitude.
Confusion exists in the area of partial prescription for non-use due to the fact that in many cases, mode of use and purpose are so intertwined that writers fail to make a differentiation. As shown before, the servitude is the right granted (to transmit, pass etc.) whereas mode of use is a means of implementation of the right. There is no doubt that to interrupt prescription, a servitude granted by title must be used. Likewise, under 765, in order to prescribe for a continuous apparent servitude some use must be made of the servitude on the servient estate. However, in these cases not only is a purpose either preserved or created, but prescription of area is interrupted. In the latter situation, the land so “used” becomes the definite limits or area of applicability of the servitude. But in both cases, one must remember that there are three conceptually different commodities involved (presently excluding accessories) — purpose, mode of use, and area.
Therefore with prescription of purpose provided for liberatively in 789, 790 and 791 and acquisitively in 765, and prescription of modes of use liberatively provided for in 796, 790 and 791 and acquisitively in 796 (according to Planiol, vol. 1 Part 2 no. 2948) the question remains as to whether the concept of prescription for non-use of area has been provided for.
The first words of 798 are “If, on the ■contrary . . .” This article therefore deals with a condition contrary to that in 797. These two articles which came into the code together in 1825 must be construed together. Art. 797 deals with expansion and 798 with contraction of some *309 thing. Certainly 798 was not enacted specifically as a redundant article to provide for restriction of the mode of use of a servitude. This concept had already been adequately provided for in 796. The only thing left without provisions for prescription is area.
Academic interpretation of the applicability of 798 as well as evidence of the frequency of its application and interpretation is pointed out in 27 La.L.Rev. 634, 635. The only instance of its direct application was the original opinion in Ohio Oil Co. v. Ferguson, 213 La. 183, 34 So.2d 746, 754 (1947). In that case the court was confronted with a mineral servitude where the beneficiary disavowed his intention or abandoned his right to drill upon a specified part of the tract subject to the servitude. The court held that 798 was applicable in that 798 provided for the relinquishment of part of the area over which the servitude might be exercised. The article was not mentioned on rehearing but the case is interesting for its interpretation of 798 as dealing with area.
The writer in 41 Tul.L.Rev. 947, 951 states that the Ohio Oil case limits the applicability of 798 to situations where the beneficiary disavows or abandons his right to exercise the servitude over a particular area. I disagree. As previously pointed out (at length), this is true only in the situation of such conceptually extensive purposes that a use of the purpose will interrupt prescription as to the entire area of a grant. Therefore it is only in such cases that a beneficiary must make such a declaration in order to deprive his use of such an extensive effect. In situations wherein a use of the purpose does not automatically interrupt prescription as to the entire area of the grant, then such declarations are not necessary. The 10 year non-use prescription may work a release of the area not used as per the previous discussion of this procedure.
Further insight into the academic evaluation of the applicability of 798 is found in 44 Tul.L.Rev. 625, 632. “Otherwise partial prescription pursuant to article 798 has been applied solely to situations where a certain strip of land has been dedicated for a roadway, and a clearly defined part of that strip of land has not been used for passage in any way. On the other hand, article 796 by its language is clearly limited in its application to situations in which different and distinct modes are granted.” (Emphasis added.)
One of the cases cited in this article for the proposition as to 798’s applicability is Hanks v. Gulf States Utilities Co., 210 So. 2d 345 (La.App. 3 Cir. 1968). There the appeal court stated at p. 348 footnote 4 “In Columbia Gulf there was also a question as to the extent, i. e., the width of the servitude which was used, an issue which addressed itself to LSA-C.C. Article 798. In the present case we are not concerned with the loss by prescription of any portion of the area of the servitude. Here, our only concern is with the loss by prescription of one of the different modes of use set forth in the title, LSA-C.C. Art. 796.” Further, on p. 351 the court said “. . . Our first answer to this contention is that we are not here concerned with Article 798, which has to do with the prescription of the extent of a servitude where less than its area is possessed.” The Supreme Court did reverse the result found in the appeal court, 253 La. 946, 221 So.2d 249, 251, but it also found, without mentioning the appeal courts interpretation of 798, that 798 did not apply to the case.
Frederick W. Ellis, an associate Professor of Law at L.S.U., indicated an inclination towards the view that 798 applies to prescription of area. See Footnote 22.
“Cf. Paret v. Louisiana Highway Comm’n, 178 La. 454, 151 So. 768 (1933), where the road was the subject of two rights-of-way servitude grants, one for its original width, and another to widen the road. The extra width, being the subject of a separate grant, prescribed *310 from non-use. A contrary result might have been reached if the whole width was the subject of one grant and part was used, although even this view is complicated by Article 798.” (Emphasis added.) 29 La.L.Rev. 185, 189.
I submit that articles 797 and 798 both apply to the area upon which a servitude may be exercised and that 798 provides a basis upon which partial prescription of the area of a servitude may be rested.
The contract which established the canal servitude in this case specifically states that the land in the grant is being placed under a servitude for the purpose of the constniction of the U.S. Bouef Cocodrie Diversion Channel Canal/Levee. It is true that there is some general language to the effect that the land is subject to whatever excavations and constructions are necessary for flood control, but I believe that the intent of such statements is that these constructions and excavations are to be incidental to the construction of the named canal. Therefore, I maintain that this servitude is one so conceptually limited in purpose that, as previously explained, the implementation, though sufficient to prevent prescription of the right or purpose of the servitude, interrupted prescription as to the area only to the extent of land physically taken by way of implementation. Land not so physically taken has not been used within the meaning of 789. Since the canal in question has remained in its present state of completion for more than 10 years, all land not physically taken and not necessary for the maintenance of the canal has reverted back to the servient estate via 789 and 798. The judgment of the trial court should be affirmed.
Where the majority erred was in their failure to recognize the conventional nature of the servitude. Instead of ascertaining the purpose of the servitude from an examination of the contractual intent of the parties, the majority has seen fit to coerce the right created by contract into one of two alternative categories found in 727 — aqueducts, or drain — which are, by the terms of the article, only illustrative of the types of servitudes which may be created by contract, i. e. “. . . and the like.” The process used to funnel the designation of the servitude before us was an inductive one of citing case authority revealing the functions of servitudes of drain and aqueduct and then applying these formulas to the finished product to see if this construction performs in one of these two manners. Thus the process was one of application of formula to implementation with a complete circumvention of the intended purpose of the servitude as set forth in the contract.
Satisfied with an “academic” narrowing of the field to drain or aqueduct, the majority proceeds to pronounce the servitude in the present case a continuous one and assumes, again without reference to the contractual purpose of the servitude, that the implementation thereof has permeated the entire grant with an interruption of prescription. They then proceed to articles 790 and 791 to see if the use of the servitude has been interrupted in accordance with these articles.
The problem is that the land in question has never been “used” and is therefore subject to prescription for failure to use. The plaintiff does not have to show an interruption of use.
The majority seems to base its whole decision upon a characterization of the servitude as continuous as opposed to discontinuous, but this question should not be reached unless it is found that the land in question has been used. It has not.
I respectfully dissent.

. I take note of the Codal limitations prescribed for conventional servitudes nominated contractually as “foot passage” (Art. 680) and the peculiar attention paid elsewhere in the Code and other places to the whole concept of passage. See Art. 771, 799. See also Cass Civ.Dec. 3, 1929 (1931) D.I. 119; Cass Civ. Aug. 20, 1882 (1883) D.I. 341 — treating passage peculiarly under their Art. 708. However I am offering my analogy only in regard to the conceptual ramifications of a servitude of generalized passage, without the adulterating effects of policy.